Luanne WALTON, Plaintiff,

v.

JOHNSON & JOHNSON SERVICES, INC., et al., Defendants.

No. 8:00–CV–1897–T–30MAP.

United States District Court,
M.D. Florida,
Tampa Division.

April 5, 2002.

Claire Saady, Saady & Saxe, Lutz, FL, for plaintiff.

Terence G. Connor, Marlene Rodriguez, Morgan, Lewis & Bockius LLP, Miami, FL, Thomas C. Garwood, Jr., Kay L. Wolf, Ford & Harrison LLP, Orlando, FL, for Johnson & Johnson Services, Inc., Orth–McNeil Pharmaceutical, Inc, defendants.

Kalvin, M. Grove, Fox & Grove, Chartered, St. Petersburg, FL, Michael Keegan Kiernan, Abbey, Adams, Byelick, Kiernan, Mueller & Lancaster, L.L.P., St. Petersburg, FL, for George Mykytiuk, defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

MOODY, District Judge.

This cause came on for consideration upon Defendants' Motion for Case Dispositive Summary Judgment (Dkt.# 52), supporting memorandum (Dkt.# 53), Plaintiff's response thereto (Dkt.# 67) and Plaintiff's Motion for Partial Summary Judgment, supporting memoranda (Dkt.# 50) and Defendants' memorandum of law in opposition thereto (Dkt.# 73).

The primary issue in both Plaintiff and Defendants' motions is a legally dispositive one in this case; that is, whether Defendants may avail themselves of the affirmative defense set forth by the United States Supreme Court in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). For the reasons set forth herein, the Court finds that Defendants may avail themselves of this defense, and when they do, the Court finds that final summary judgment is appropriate as there are no disputed issues of material fact as to Plaintiff's claims of sexual harassment and retaliation or as to her other state law claims.

## I. FACTUAL BACKGROUND

There are myriad facts in this case, both disputed and undisputed, relating to Plaintiff's claims of sexual harassment and retaliation [1] and state law claims of negligent retention and intentional infliction of emotional distress.[2] At the summary judgment stage, the Court utilizes only the undisputed facts, taking all other facts in the light most favorable to Plaintiff.

Plaintiff was employed by Defendant Ortho–McNeil Pharmaceutical Inc. (referred to hereinafter with Defendant Johnson & Johnson as "Defendants"), in Virginia Beach, Virginia, as a pharmaceutical sales representative since 1991. In 1997, Plaintiff obtained a lateral transfer as a sales representative to the Tampa district. In January, 1999, Defendants hired Defen-

---

1. Plaintiff alleges violations of both federal (Title VII) and state law (Florida Civil Rights Act) for her claims of harassment and retaliation. These claims are analyzed under the same framework. *See Harper v. Blockbuster,* 139 F.3d 1385, 1387 (11th Cir.1998).

2. The infliction of emotional distress claim was also brought against the alleged harasser,

Defendant George Mykytiuk. Plaintiff also filed a claim for assault and battery against Mykytiuk. Two months after the case was filed, Plaintiff and Mykytiuk filed a joint stipulation of dismissal with prejudice (Dkt.# 20) as to the claims against him, which was subsequently approved by this Court.

dant George Mykytiuk as the district sales manager of the Tampa unit where he acted as Plaintiff's direct supervisor. Plaintiff and her supervisor, Mykytiuk, worked in Defendants' business unit that markets Levaquin, a broad spectrum antibiotic, and Ultram, an analgesic remedy. These pharmaceuticals are distributed through a network of districts in which sales representatives call on physicians, pharmacists and hospitals to persuade them of the merits of prescribing and filling prescriptions with their drugs in appropriate medical circumstances.

Mykytiuk had previously worked as a pharmacist in New Jersey and then in various positions with Eli Lilly before joining Defendants. In addition to Plaintiff, nine or ten other sales representatives reported directly to Mykytiuk. At all times Mykytiuk directly supervised and made employment decisions affecting Plaintiff and the other sales representatives assigned to him. The sales representatives and district sales managers did not have an office location, instead working out of their home offices. Any meetings were generally held in places of public accommodation such as restaurants or hotel lobbies.

Mykytiuk was directly supervised by Cathy Wichert, who is located in Jacksonville, Florida. Wichert did not have any regular scheduled contact with Mykytiuk and communicated with him most often by e-mail. Wichert's direct supervisor was located in New Jersey.

At the time he was hired, Mykytiuk did not have prior experience in supervising or managing employees. Defendants completed their "normal" background check (i.e., social security, motor vehicle and criminal records) on Mykytiuk and received a copy of his college transcript. Defendants did not contact Mykytiuk's then current employer (not contacting present employers appears to be standard practice for Defendants). (Wichert Dep. at 24–25, Ralph Dep. at 30–31, 109, Exh. 5). Mykytiuk was interviewed by Wichert, who also checked with two other employees who had previous work experience at Eli Lilly (at the time when Mykytiuk worked there) to confirm that Mykytiuk "was who he said he was on the interview from a position standpoint and that he was—just to validate his employment," but not to confirm that he was actually employed there at the time of the interview. (Wichert Dep. at 24).

Plaintiff's initial contact with Mykytiuk occurred in Spring 1999. In June and early July, 1999, Plaintiff claims that Mykytiuk first expressed a sexual interest in her, which included asking "inappropriate questions concerning her personal life, inappropriately taking her to a movie during working hours, kissing and fondling her, demanding that she meet him at his home, showing her a gun that he kept at his apartment, constantly telephoning her on her cell phone for non-business related matters and showing up at her home uninvited." (Dkt.# 50, ¶ 8). Plaintiff further claims that she was raped and forced to have sexual intercourse with Mykytiuk at his apartment (twice on one occasion) on June 29 and July 8, 1999. The record reveals that Mykytiuk claims that the sex was consensual. Significantly for purposes of the summary judgment motion, Defendants do not contest that Mykytiuk committed "unwelcome sexual advances" on Plaintiff prior to September, 1999.

It appears that Plaintiff attempted at some point, whether the sex was consensual or not, to discuss limiting contact with Mykytiuk to a "strictly professional relationship." It is undisputed that Plaintiff attended a joint therapy session with Mykytiuk and his therapist during which Plaintiff requested, and Mykytiuk agreed, to a "strictly professional relationship." Plain-

tiff alleges that Mykytiuk did not live up to the agreement as evidenced by several other incidents in August, 1999, including sexual touching and comments, showing up at her house uninvited, offering to buy gifts for her, and other inappropriate conduct.

On September 3, 1999, being "driven crazy" with the "persistent and relentless sexual harassment" by Mykytiuk, Plaintiff telephoned Defendants' human resources department to complain about his conduct. Initially her call was anonymous, although the human resources representative who took her call advised Plaintiff that she had enough information from the telephone call to enable her to identify both the caller and the manager. She advised Plaintiff that she preferred to have Plaintiff make the decision to file the report on her own and asked Plaintiff to take the weekend to consider it. Plaintiff followed her advice and because it was a holiday weekend, called back on Tuesday, September 7, 1999, to again report the excessive attention and attempts by Mykytiuk to kiss and hug her.

The human resources representative assigned to Plaintiff's unit, Renee Ralph, immediately called Plaintiff and arranged to meet with her in Tampa on September 10, 1999. Ralph spent several hours interviewing Plaintiff who gave her extensive information including her own typewritten account of her complaints. At that time,

Plaintiff did not report any incidents of sexual intercourse but expressed concern over her personal security, especially during the time period that Defendants planned to meet with Mykytiuk.

On September 15, 1999, Mykytiuk's supervisor summoned him to Tampa where she introduced him to Ralph who questioned him for several hours on Plaintiff's claims.[3] Of course, Mykytiuk described the relationship to be entirely consensual, including all occasions of sexual intercourse[4] and other personal details. Immediately following the interview, Mykytiuk was suspended and put on paid administrative leave. Defendants immediately began a full investigation of the matter.

At that time, Plaintiff had not told Defendants that Mykytiuk raped her. Several days later on September 17, Plaintiff first told her husband she was raped by Mykytiuk on two occasions,[5] and on September 20, Plaintiff filed a police report alleging rape.[6] Plaintiff then informed Defendants that Mykytiuk, in addition to the other reported harassment, also raped her. Plaintiff also obtained a temporary restraining order against him, but he was never served. Apparently, Mykytiuk relocated to Michigan during this time.

Defendants' investigation took until mid-December, 1999, to complete. During the investigation, Ralph and an investigator

3. Due to Plaintiff's fear for her personal security, Defendants paid for Plaintiff and her husband to be out of their Tampa home during the time of this meeting. (Walton Dep. at 608).

4. Mykytiuk claims there were several, four to six, incidents of sexual intercourse with Plaintiff. Plaintiff denies this claim and points out that for some of those alleged incidents, she was out of town or on the telephone.

5. Plaintiff told her husband after learning that the notes of her therapy session with Myky-

tiuk were being requested in Mykytiuk's divorce case. The therapist's notes reveal, in part, that the sex was consensual—a claim that Plaintiff denies. She maintains that she did not report the rape because she was in fear of losing her job and due to the psychological stress from the alleged harassment. She maintains that the therapist's notes are incorrect and that she told the therapist that she had sex with Mykytiuk but "didn't want to." (Walton Dep. at 357).

6. In December 1999, the police declined to prosecute Mykytiuk for rape.

conducted numerous interviews, including additional interviews with Mykytiuk and Plaintiff. In December, Ralph and the investigator reported their findings to Defendants' management personnel in New Jersey—they were not able to rule out the possibility of a consensual sexual relationship between Plaintiff and Mykytiuk. They also could not find that Mykytiuk committed rape. Nevertheless, the decision was made to discharge Mykytiuk due to his exercise of poor judgment in becoming involved with his subordinate employee and for not working on company time. (Mykytiuk Dep. at 234). Mykytiuk was terminated as of December 31, 1999. Notably, from the time of Plaintiff's first report of sexual harassment (September 3, 1999), she was kept completely separate and apart (with full pay) from Mykytiuk in the workplace.[7]

On January 11, 2000, Defendants flew Plaintiff and her husband to the New Jersey office to report to them the results of the investigation. Plaintiff and her husband strongly disagreed with the results of the investigation, especially the implication that the sex was consensual. Plaintiff expressed her displeasure with the length of the investigation and the way Ralph and the investigator conducted the investigation.[8] Specifically, Plaintiff complains that

Defendants did not believe her that she had been raped and that the investigation was faulty because certain individuals she identified and suggested be interviewed were not. Plaintiff had made some of these same complaints during the investigation. (Walton Dep. at 510).

After her call to the human resources department in September, Plaintiff claims that she was told by Ralph to "call in sick" to work. (Walton Dep. at 460). After reading the employee manual, Plaintiff believed that she could be terminated after five days sick time without a doctor's excuse. (Walton Dep. at 458, 483–84). After attempting to return to work for one day, Plaintiff was placed on paid administrative leave. Plaintiff also claims that she was told to apply for workers compensation[9] and short term disability.[10] (Walton Dep. at 484, 487). She was eventually approved for short-term disability in January, 2000 (retroactive to November 17, 1999, the day she first called the carrier). Her disability diagnosis was post-traumatic stress disorder as a result of the alleged sexual harassment.

On May 12, 2000, Defendants sent Plaintiff a letter reminding her that she was close to exhausting her short-term disability benefits (which are available for a total

---

7. Plaintiff claims that Mykytiuk made "constant telephone calls" to Plaintiff (identified by her caller ID) after his suspension and termination. (Walton Dep. at 473–76). After his termination, Plaintiff obtained a restraining order against Mykytiuk, in part, based on cellular phone records she obtained showing these calls. (*Id.*)

8. After the meeting, Plaintiff and her husband demanded a meeting with higher management personnel at Johnson & Johnson. On January 12, 2000, Plaintiff and her husband met with a senior human resources executive with Johnson & Johnson.

9. The workers compensation carrier informed Plaintiff that in Florida, claims for sexual

harassment were not covered by workers compensation. Plaintiff contends that Defendants made her "go on a goat rope" by spending time calling worker's compensation when the claim was futile. (Walton Dep. at 487).

10. It appears that Plaintiff was informed of the short term disability plan and benefits by Ralph who told her she could call the short term disability carrier to apply for benefits when she "felt like it." (Walton Dep. at 639). Plaintiff testified that she did not think it was appropriate for human resources to tell her about short term disability benefits, instead Defendants' "occupational health services" should have informed her. (Walton Dep. at 638). The Court finds this is a distinction without difference.

of 26 weeks) and under the terms of the plan, would lose her active employment status if she did not return to work at the end of that time period. (Dkt. 53, Bobier Aff., ¶ 5). The letter reads, in pertinent part, as follows:

Because you have exhausted the full 26 weeks of STD on May 16 in accordance with the disability plan, effective May 17, you will no longer have reinstatement rights to the sales representative position. This means that if you are unable to return to work by May 16, 2000, you will no longer be considered an active employee. If that is the case, a company representative will contact you to arrange for a checkout date. The purpose of the checkout date is to collect all Ortho–McNeil property. You can expect to be contacted by Cathy Wichert. I have included excerpts from the STD–LTD plans.

It is my understanding that you have applied for Long Term Disability Benefits through Kemper National Services. We have been advised that your file is currently being reviewed for LTD benefit consideration and that an independent medical evaluation was scheduled for May 9, 2000, as part of this process. If approved by Kemper National Services, you will be eligible to receive LTD benefits under the J & J Choices Plan. You elected coverage at the 60% option and will be advised of the appropriate application process by Kemper. Should you be approved for LTD and later be medically cleared to return to the work force, you would have to reapply for employment since, as explained above, you have exhausted the 26 weeks maximum for STD and are no longer an

active employee. A member of my staff or I will be happy to assist you in trying to locate available employment opportunities at that time.

Plaintiff did apply and qualify for long-term disability benefits, upon medical certification that she could not work, and was terminated from active employment status with Defendants effective May 17, 2000.[11] (Bobier Aff., ¶¶ 5–7). Plaintiff has since attempted to return to work for Defendants after receiving a medical "return to work" form signed by her physician dated February 5, 2002, which releases her to return to work as a sales representative.[12] Re-employment opportunities for Plaintiff are being explored by Defendants.

To support its assertion of the affirmative defense from *Ellerth* and *Faragher,* Defendants have provided a copy of the sexual harassment policy in effect which is included as part of Defendants' employee policy manual. (Dkt. # 53, Taylor Aff., Exh. 1). Defendants also annually mail a letter to employees concerning "harassment in the work place." (Dkt. # 53, Taylor Aff., Exh. 2). Defendants' policy prohibits harassment or discrimination (including a definition of sexual harassment) and details how complaints of harassment are handled and investigated.

Additionally, Mykytiuk participated in sexual harassment training provided by Defendants on September 1, 1999, approximately nine months after he was hired. Plaintiff testified that she never received a copy of the annual letter mailed to employees and never received any sexual harassment training during her employment with Defendants.

---

**11.** Plaintiff filed this lawsuit on September 15, 2000.

**12.** When questioned as to whether Plaintiff tried to return work at any time after September 1999, she testified "I wasn't capable to go back to work. [Q:] So you did not try to do that because you weren't physically or mentally able to, were you? [A:] Because I was raped. That's the evaluation of the doctors." (Walton Dep. at 707).

## II. LEGAL ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires summary judgment if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant can meet this initial burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of the case on which he or she bears the ultimate burden of proof. *Id.* The evidence must be viewed in the light most favorable to the non-moving party. *See Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir.1988).

Once the moving party has met his or her burden, Rule 56 requires the nonmoving party to go beyond the pleadings and by affidavit(s), or by the "depositions, answers·to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in the nonmovant's favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers National Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir.1990). Employment discrimination cases should not be treated differently from other ultimate questions of fact that arise in other cases. *Chapman v. A.I. Transport*, 229 F.3d 1012, 1026 (11th Cir.2000).

### B. General Principles of Ellerth/Faragher Defense

In *Ellerth* and *Faragher*, the Supreme Court considered an employer's vicarious liability for sexually harassing conduct by a supervisor—"[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with the immediate (or successively higher) authority over the employee." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. In analyzing the applicability of what this Court refers to as the "*Ellerth/Faragher* defense," an employer's liability for a supervisor's harassment is separated into two cases: 1) harassment which culminates in a "tangible employment action" such as discharge, demotion or undesirable reassignment, and 2) harassment in which no adverse "tangible employment action" is taken but which is "sufficient to constructively alter an employee's working conditions." *Frederick v. Sprint/United Mgt. Co.*, 246 F.3d 1305, 1311 (11th Cir.2001), *citing Ellerth*, 524 U.S. at 761–63, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 790, 807, 118 S.Ct. 2275. Under this framework, the Supreme Court held that an employer is automatically vicariously liable or, strictly liable, for sexual harassment which results in an adverse "tangible employment action." *Id.* Conversely, when there is no adverse tangible employment action, an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the two-prong affirmative defense described by the Court in *Ellerth* and *Faragher*. *Id.*

The two prongs or elements of the *Ellerth/Faragher* defense are: "1) that the employer exercised reasonable care to pre-

vent and promptly correct harassing behavior, and 2) the plaintiff-employee unreasonably failed to take advantage of any protective or corrective opportunities provided by the employer, or to otherwise avoid harm." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. A defendant employer must satisfy *both* elements to avoid liability and bears the burden of proof on *both* elements. *Frederick*, 246 F.3d at 1312. *See Johnson v. West*, 218 F.3d 725, 731 (7th Cir.2000) (when court failed to make factual findings about the reasonableness of the plaintiff's failure to take advantage of preventative or corrective opportunities provided by defendant employer, the case was remanded for further proceedings).

As the Court explained in *Frederick*, an employer does not always have to show a formal sexual harassment policy to meet its burden of proof on the first element; however, an employer's establishment of a sexual harassment policy does not automatically satisfy its burden. As to the second part of the first element, an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to an employee's complaint. *Frederick*, 246 F.3d at 1313–1314. Additionally, as to the second element of the defense, an employer showing that the plaintiff-employee failed to follow its complaint procedures will often be sufficient to satisfy its burden; however, in some cases the proof will show that the employee's non-compliance was "reasonable under the circumstances." *Id.*

## C. *Application of the Ellerth/Faragher Defense*

### (1) *Tangible Employment Action*

■ The parties strongly dispute whether Plaintiff suffered a "tangible employment action" which is a condition precedent for Defendants to be able to assert the *Ellerth/Faragher* defense. The Su-

preme Court provides the following guidance on this issue:

A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control. Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. The supervisor often must obtain the imprimatur of the enterprise and use internal processes. For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer.

*Ellerth*, 524 U.S. at 761–63, 118 S.Ct. 2257 (citations omitted).

Here, Plaintiff claims that she suffered a tangible employment action when she was terminated from her employment with Defendants on May 17, 2000. Defendants maintain that the termination of Plaintiff from active employment status was not a tangible employment action but instead an administrative processing of Plaintiff's seeking and obtaining long term disability benefits. Defendants argue further that even if the "termination" was considered a tangible employment action for these purposes, it was not taken by her supervisor and therefore does not preclude the Defendants' availing themselves of the *Ellerth/Faragher* defense.

Although it is clear that a termination is a tangible employment action, a look at the facts behind Plaintiff's active employment status termination on May 17 reveals that it should not be considered a tangible employment action. As a result of her disability, Plaintiff was unable to work and therefore, qualified for and received short term disability benefits. Then, after her short term disability benefits expired, in order to avail herself of her long term disability benefits, her termination as an active employee was required. (*See* Dkt. # 73, Exh. 2, Exh. 1). The disability determination was not made by Defendants, but by Plaintiff when she applied for long term disability benefits and by a physician when she qualified for benefits after an independent medical examination. Furthermore, there is no causal connection between Defendant's action in terminating her as an active employee at the conclusion of her twenty-six weeks on short term disability leave and the sexual harassment committed by her supervisor. *See Freder-*

*ick,* 246 F.3d at 1312. To consider this action a tangible employment action by Defendants does not fit within the scheme and goals of Title VII—it is not appropriate that an affirmative act by Plaintiff (of qualifying for and collecting disability benefits) and the resulting administrative circumstances should deprive the company of its affirmative defense.

Moreover, even if this action was considered a discharge by Defendants (which this Court does not find), it was not taken by Mykytiuk, her supervisor, and as such fails to constitute a tangible employment action for purposes of the applicability of, and the reasoning behind, the *Ellerth/Faragher* defense. *See Johnson v. West,* 218 F.3d 725, 731 (7th Cir.2000) ("[w]hen a supervisor takes a tangible employment action—in contrast to harassment that does not involve such a tangible action— there is assurance the injury could not have been inflicted absent the agency relation and thus the supervisor's action becomes for Title VII purposes the act of the employer"). That is, there was no "quid pro quo;" Mykytiuk did not use his "supervisory authority" to get Plaintiff fired or demand sex in return for a promotion. In fact, Mykytiuk was long suspended and terminated at the time Defendants administered the termination of her active employee status in May 2000.

To the extent that Plaintiff argues that her discharge was a constructive discharge, an argument which she could make by virtue of the fact that the alleged harassment led to her disability, the Court does not agree.[13] Accordingly, because Plaintiff suffered no tangible employment

---

**13.** In her opposing memorandum, Plaintiff maintains that this issue is "not present in this case," yet maintains that the disability and termination were a "direct result of her supervisor's sexual harassment." Courts are split as to whether constructive discharge constitutes a tangible employment action.

*See e.g. Desmarteau v. City of Wichita,* 64 F.Supp.2d 1067, 1078–79, n. 4 (D.Kan.1999). Defendants attach the court's opinion in *Rabassa v. Evelyn,* Case No. 97–2105–CIV–GRAHAM, (S.D.Fla.1999) (Dkt.# 73, Exh. 3) which has been affirmed by the Eleventh Circuit. There, Judge Graham reasoned that

action by Defendants, they are permitted to go forward with establishing the elements of the affirmative defense.

### (2) Elements of the Ellerth/Faragher Defense

■ The first element of the *Ellerth/Faragher* defense, that the employer exercised reasonable care to prevent and promptly correct harassing behavior, involves two parts: the prevention and the prompt correction of harassing behavior. In applying the facts of this case to this element, it appears that Defendants have established the first part of the first element by the presentation of (1) a sexual harassment policy contained in its policy manual (Dkt. # 53, Taylor Aff., Exh. 1) and (2) a letter regarding sexual harassment in the work place sent annually to all employees (*Id.*, Exh. 2). Defendants' policy specifically prohibits harassment or discrimination (with a definition of sexual harassment) and details how complaints of harassment are handled and investigated.

There is also evidence in the record that Plaintiff's supervisor, and other district managers, attended sexual harassment training. Although Plaintiff testifies that she did not receive the letter sent to em-ployees and that her supervisor did not attend training until after the alleged sexual harassment, these items are not sufficient to overcome Defendants' evidence on the prevention part of the first element of the *Ellerth/Faragher* defense.[14]

■ The second part of the first element—whether Defendants took reasonable care to correct any sexually harassing behavior—requires the Court to inquire into whether Defendants acted promptly on Plaintiff's complaint when given notice of her allegations through the methods set forth in Defendants' policy. Defendants contend that they acted reasonably and promptly in correcting and preventing any further sexually harassing behavior by immediately suspending Mykytiuk and insuring that Plaintiff had no further work contact with him (which continued throughout the investigation). Plaintiff, although she was out on disability leave, does not contend that she ever had to work with Mykytiuk again.

The facts reveal that Plaintiff first informed Defendants of some portions of the alleged sexual harassment on Friday, September 3, 1999, and again on Tuesday, September 7, 1999 (Monday, September 6 was the Labor Day holiday).[15] A repre-

---

constructive discharge does not carry with it the necessary "imprimatur" of the enterprise to be considered a tangible employment action.

14. Plaintiff further contends that Defendants' harassment policy is inadequate because in cases like hers where it is not appropriate to report the harassment to the employee's supervisor, the employee is directed to request a "confidential discussion with the appropriate Organizational Effectiveness representative" and that Defendants have not adequately identified that person. Nevertheless, Defendants submitted a copy of an annual letter to employees regarding harassment in the work place that adequately identifies that "[i]n instances where a supervisor may be involved in the incident, misconduct should be reported to a higher level of management or to a

Human Resources Representative" and continues to assure employees that there is "an employee complaint procedure for investigating and resolving such complaints." Moreover, when Plaintiff decided to complain, she does not contend, nor are there any facts in the record to support the contention, that she had any difficulty in finding the person or office to complain to when she telephoned the human resources department in Defendants' New Jersey office. As such, the Court does not find these alleged inadequacies in the policy are material issues of fact which would preclude summary judgment in favor of Defendants on the *Ellerth/Faragher* defense.

15. Although Defendants do not address Plaintiff's contention that two senior members of Johnson & Johnson were informed of the allegations of harassment through a con-

sentative of Defendants' human resources department immediately followed up with Plaintiff and arranged a meeting in Tampa on September 10, 1999. The investigators then met with Mykytiuk on September 15, and immediately thereafter suspended him. It is undisputed that Plaintiff never worked with him again. Defendants did all they could to insure from that point forward, that in her workplace, Plaintiff no longer had to endure harassing behavior from her supervisor.

Plaintiff's contention that Defendants should have known of the harassment by virtue of another sales representative's observations that Mykytiuk was acting "strange and weird" and expressing an interest in female customers is meritless. First, this observation was made during the investigation, after Plaintiff reported the harassment and cannot therefore serve as notice to Defendants. Also, such information, even if timely, is patently insufficient to put Defendants on notice of the pervasive or severe harassment Plaintiff alleges she suffered.

Plaintiff further contends that Defendants did not act with "reasonable promptness" because their investigation took too long (approximately three months) and that Mykytiuk was not immediately fired upon her initial telephone complaint. In essence, Plaintiff is dissatisfied with both the process and the results of the investigation. She also believes that Defendants should have disciplined Mykytiuk differently. None of Plaintiff's subjective opinions or perceptions, even if taken as true, create issues of material fact sufficient to overcome Defendants' proof on this element. The Court finds that Defendants have carried their burden on the first element of the *Ellerth/Faragher* defense.

█ Defendants must also sustain their burden of proof on the second element of the defense—that the plaintiff-employee unreasonably failed to take advantage of any protective or corrective opportunities provided by the employer, or to otherwise avoid harm. It is undisputed that Plaintiff took advantage of the company's protective/corrective opportunities when she made her initial telephone complaint to human resources about Mykytiuk's harassing conduct. The question remains whether this conduct was reasonable.

Defendants maintain that Plaintiff *unreasonably* failed to take advantage of this opportunity because she failed to *promptly* complain, claiming that she waited nearly three months after the first act of alleged harassment to call Defendants' human resources department. Plaintiff argues that her complaint was made five days after the last act of harassment by Mykytiuk and

---

versation with a friend of Plaintiff's, Kim Van Goidtsnoven, who was employed as a sales representative with another subsidiary of Johnson & Johnson, the Court does not find this argument availing because she is not the person identified in the company's harassment policies. *See Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290 (11th Cir. 2000) (employer was on notice of alleged sexual harassment when employee contacted persons identified in employer's sexual harassment policy, not when they complained informally to various mid-level managers). Moreover, even if these conversations constituted notice of the harassment, the issue of whether Defendants acted with reasonable promptness remains. Plaintiff's conversation with Van Goidtsnoven didn't occur until August. (Van Goidtsnoven Dep. at 26, 28) ("within August in about a two-week time frame ... probably close to the end of August"); (Walton Dep. at 447–48) ("... it was sometime like mid-August"). And both of the senior management personnel told Van Goidtsnoven (who in turn told Plaintiff) that she should go to human resources to report Mykytiuk's conduct. In light of the circumstances, the Court finds that Defendants were acting with "reasonable care" to correct the sexually harassing behavior when they responded to Plaintiff's complaint in early September.

any delay in her complaining was reasonable because she did so out of fear that she would lose her job.[16]

Defendants' policy is in place in an attempt to protect employees from suffering from sexual harassment or continued sexual harassment. The three month delay by Plaintiff in reporting the first alleged act of harassment (and thus allowing it to continue) initially weighs against her on this element.

In defense of her claim, Plaintiff contends that this delay should be excused due to her fear of losing her job. Although some courts have taken a lenient view in determining what is reasonable in cases involving the victim's fear of losing her job in retaliation for complaining, the Court does not view this as that type of case, nor does the record support a finding that her fear was reasonable. *See Johnson*, 218 F.3d at 731; *see also Maple v. Publications Internat'l, Ltd.*, 2000 WL 1029112 (N.D.Ill.2000). Unlike the facts of *Johnson*, Plaintiff was not threatened that if she took any action against Mykytiuk, it would come "at the price of her job," nor was she a probationary employee. To the contrary, she was a nine year employee and Mykytiuk was a more recent hire (approximately ten months).

Moreover, the only evidence in the record is that Plaintiff feared not getting a promotion from Mykytiuk (because of his alleged influence with persons in Defen-

dants' higher management). Although Plaintiff calls this "intimidation," there is no evidence, other than Plaintiff's subjective opinion or perception, that Mykytiuk threatened her with losing her job. Plaintiff has failed to articulate a specific factual basis for being in fear of losing her job. *See* Walton Dep. at 390–91, 415–16, 544. Plaintiff has not provided sufficient evidence from which this Court could find that her fear was reasonable so as to excuse her from taking advantage of the preventive and corrective opportunities provided by Defendants in a reasonably prompt manner, or otherwise failing to avoid harm.[17]

In addition to the fear of losing her job in retaliation for complaining, Plaintiff also argues that her ability to complain was impaired by the emotional and psychological stress she suffered as a result of the harassment and that she should be excused from promptly reporting the harassment for this reason. The record certainly establishes that she suffered from a disabling psychological condition (e.g., she was diagnosed with post-traumatic stress disorder). The Court, however, declines to use this later diagnosis to obviate her need to act promptly to report the harassment or to otherwise avoid further harm at the time of the harassment.

Viewing the facts in the light most favorable to the Plaintiff, the Court finds that Defendants have carried their burden

---

**16.** Plaintiff testified that Mykytiuk knew the company's vice-president and told her how "well connected" he was in the company and that if she "stayed close to him," he could help promote her to hospital sales representative. (Walton Dep. at 313, 528). Plaintiff also knew that Mykytiuk was hired laterally from another pharmaceutical company, which she claims is not a common practice for Defendants.

**17.** In addition, as Defendants point out, there is evidence in the record that during the time

that Plaintiff failed to notify Defendants of the harassment, she also failed to "otherwise avoid harm" by placing herself in situations that permitted further harassment by Mykytiuk (for example, going back to his apartment or hotel room with him or accepting a key and the security access code for his apartment). *See* Walton Dep. at 240, Exh. 5; Mykytiuk Dep. at 436. Plaintiff's alleged fear of losing her job also fails to excuse this behavior for the same reasons set forth above.

on the second element of the *Ellerth/Faragher* defense. Accordingly, summary judgment in Defendants' favor is warranted on Plaintiff's sexual harassment claim because Defendants have properly raised and sufficiently established all elements of the *Ellerth/Faragher* defense, which disposes of Plaintiff's claim.

## C. Retaliation Claim

In order to state a claim for retaliation, a plaintiff must establish each element of a *prima facie* case. To do so, Plaintiff must show that: 1) she engaged in statutorily protected expression, 2) she suffered an adverse employment action, and 3) that there is some causal connection between the two events. *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998).

■ Plaintiff claims that she engaged in a number of protected activities in order to establish the first element of a *prima facie* case of retaliation. The Court finds that Plaintiff established that she engaged in a protected activity when she filed a complaint with Defendants' human resources department in September, 1999. The other activities listed by Plaintiff (Dkt. # 67 at 17), which include her telling Mykytiuk that his "sexual demands were unwelcome" and going to his therapist with him to "engage in an agreement that they would only have a professional relationship" are not activities for which Defendants may be held vicariously liable. *Inter alia*, Mykytiuk, as Plaintiff's direct supervisor, is not the appropriate person identified by Defendants' policies to whom to report harassment when he is the alleged harasser, nor is Mykytiuk's independent therapist. *See Madray*, 208 F.3d at 1299–1301. Additionally, reporting the harassment to her friend at another Johnson & Johnson subsidiary, who reported it to her supervisors, is also not a protected activity, for the reasons discussed *supra*, *n. 15*.

■ As to the second element, Plaintiff claims that she "suffered a series of retaliatory actions, culminating in her termination." (Dkt. # 67 at 18). The only activities, other than termination, that she lists is that she was "told to stay home and take 'sick time' " and then told to apply for workers compensation (which as it turns out does not include claims for sexual harassment). The Court finds that Plaintiff fails to establish the second element of her prima facie case because the conduct alleged as a "series of retaliatory actions" fails to qualify as adverse employment actions. As Defendants correctly state, the alleged conduct must meet some threshold of substantiality. *See Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir.2000), *cert. denied*, 531 U.S. 1076, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001); *see also Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir.1998) ("not everything that makes an employee unhappy is an actionable adverse action"). These actions do not.

■ Plaintiff's claim that her termination constitutes an adverse employment action is also misplaced. As this Court has previously explained, her termination is not an adverse employment action by Defendants, instead it was a removal of Plaintiff's name from active employment status as a result of her applying for disability leave and receiving a diagnosis from a physician that she was suffering from post-traumatic stress disorder and was disabled for purposes of qualifying for short-term, and later long-term, disability benefits.

Plaintiff alleges that *these disability benefits* "deprived her of her full salary benefits, car and job advancement." Plaintiff provides no factual support for this allegation. Plaintiff's allegation that the disability benefits, not Defendants, deprived her of these items is not sufficient to establish an adverse employment action

or causal connection between her complaint of harassment and the active employment status termination. As such, her termination does not constitute an adverse employment action for purposes of making out a claim for retaliation. Accordingly, because Plaintiff has failed to establish a *prima facie* case of retaliation, Defendants are also entitled to summary judgment on this claim.

### D. *Plaintiff's State Law Claims.*

In addition to Plaintiff's Title VII and FCHR claims, she also asserts claims against Defendants for intentional infliction of emotional distress and negligent hiring, retention and supervision. At the time the Plaintiff filed her Complaint, her Title VII claims (sexual harassment and retaliation) presented a federal question within the original jurisdiction of this Court. At that time the Court exercised supplemental jurisdiction over the state law claims. The Court has now granted summary judgment in favor of Defendants on Plaintiff's federal question claims. Therefore, it is within the Court's discretion whether it will continue to exercise jurisdiction over the remaining pending state law claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Rice v. Branigar Org., Inc.,* 922 F.2d 788 (11th Cir.1991). The Court continues to exercise its supplemental jurisdiction over Plaintiff's state law claims and finds final summary judgment in favor of Defendants is also warranted on these claims.

### Negligent Retention

█ In Count IV of her complaint, Plaintiff claims that Defendants should be liable for the negligent hiring, retention and supervision of Mykytiuk. In her complaint, Plaintiff alleges that Defendants had a "duty of conducting an investigation into the background of supervisors and further had a duty of supervising the em-

ployment decisions affecting persons in positions such as that occupied by Plaintiff" and that "prior to hiring Mykytiuk, the corporate Defendants knew or should have known of his unfitness to supervise female employees, and upon information and belief, problems that he had at his previous employment. During the course of Plaintiff's employment, corporate Defendants became aware of the problems of Mykytiuk that indicated his unfitness, but corporate Defendants failed to timely take appropriate action, thus resulting in Plaintiff's physical impact of the intentional infliction of emotional distress." (Complaint, ¶¶ 59, 64).

█ On this claim, the Court finds that there is inadequate factual support in the record. Quite simply, when an employer fails to take any corrective action against an employee because the employer has no notice of problems with the employee's fitness, that employer is not liable under Florida law for negligent supervision or retention.

Also, as discussed *supra,* the Court does not find that Defendants failed to "timely take appropriate action" because Defendants did not become aware of any problems with Mykytiuk that would indicate "his unfitness" until September, 1999, when they immediately suspended him. There is no evidence that he was not being supervised. That leaves as the sole allegation supporting Count IV of the Complaint that Defendants failed to conduct an appropriate background investigation into Mykytiuk and "knew or should have known of his unfitness to supervise female employees."

Plaintiff makes much of the fact that Defendants did not contact Mykytiuk's current supervisor prior to hiring him. This appears to be a common hiring practice when an employee is searching, confidentially, to change jobs. Plaintiff's claim

would seem to support the untenable position that individuals cannot conduct, and employers comply with requests for, confidential job searches. Moreover, the record contains evidence that Wichert did check with other employees of Defendants whom she knew had worked at Mykytiuk's former employer at the time he worked there. Defendants also engaged in a standard and preliminary background investigation of Mykytiuk before hiring him.[18]

Plaintiff further alleges that Defendants did not properly investigate Mykytiuk because they did not adjudge his ability to supervise employees. Even if Defendants did not evaluate Mykytiuk's supervisory abilities or require that he have supervisory experience, that would not be sufficient to support a claim for negligent hiring. If so, a company could never hire a supervisor without supervisory experience and hiring supervisors would eventually become impossible. Nor is the Court willing to make the leap that a potential employee's failure to have supervisory experience would put a defendant employer on notice that the potential employee would sexually harass a female employee whom he then supervised. *See Garcia v. Duffy*, 492 So.2d 435, 441 (Fla. 2d DCA 1986) (the "standard of care" for a company is one which a "reasonably prudent man" would exercise in choosing or retaining an employee for the "particular duties to be performed"). On this record, the Court finds that summary judgment in favor of Defendants is appropriate on Plaintiff's claims of negligent hiring, retention and supervision.[19]

## Intentional Infliction of Emotional Distress

 Under Florida law, a claim for intentional infliction of emotional distress is established by conduct alleged to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278 (Fla.1985). Plaintiff claims that there is "no doubt" that rape should be considered such conduct and asserts that Defendants may be held vicariously liable for this rape where it "arises from the acts of its agents."

Defendants contend that they are not vicariously liable for Mykytiuk's actions and cite to Florida law holding that claims for sexual harassment are not covered by workers compensation as support for this contention. *See e.g., Byrd v. Richardson–Greenshields*, 552 So.2d 1099 (Fla.1989); *Schwartz v. Zippy Mart, Inc.*, 470 So.2d 720, 724 (Fla. 1st DCA 1985), *overruled on other grounds by Byrd*. From this area of law, Defendants conclude that they are not liable for Mykytiuk's intentional and violent acts because they did not place Mykytiuk in a situation with Plaintiff where his raping her was a "virtual certainty." (Dkt. # 53 at 19). The Court declines to apply this standard to this conduct; however, it does find that Plaintiff has failed to establish, on this record, that Defendants should be held vicariously liable for Mykytiuk's conduct for the reasons set forth *supra* and because there is no evidence that Mykytiuk's harassing conduct was in fur-

---

18. The record also supports Plaintiff's contention that Mykytiuk was not hired through the "standard" or more common practice of "coming up" through the company. The Court does not find this contention sufficient to support a claim for negligent hiring, either standing alone or in combination with Plaintiff's other contentions.

19. Plaintiff points to a complaint of sexual harassment that has been filed against Mykytiuk at a *subsequent* employer. (Dkt. # 67 at 20). Such a complaint is irrelevant to this action and should be stricken.

therance of the business interests of Defendants. *See Ayers v. Wal–Mart Stores, Inc.*, 941 F.Supp. 1163, 1169 (M.D.Fla. 1996) (no claim for intentional infliction of emotional distress when assault is "purely personal to servant, having no real connection with master's business").

Furthermore, without vicarious liability, the only actions taken by Defendants are their response to and investigation of Plaintiff's complaints of sexual harassment. Defendants' conduct in the investigation, even taken in the light most favorable to Plaintiff, is certainly not the type of conduct that meets the high standard set forth in *Metropolitan Life* to constitute intentional infliction of emotional distress. Accordingly, the Court finds that summary judgment in Defendants' favor is warranted on Plaintiff's claims of intentional infliction of emotional distress.

### III. *CONCLUSION*

Accordingly, for the reasons set forth herein, Defendants' Motion for Case Dispositive Summary Judgment (Dkt.# 52) is hereby **GRANTED** and Plaintiff's Motion for Partial Summary Judgment (Dkt.# 50) is **DENIED.** The Clerk is directed to enter final summary judgment in favor of Defendants on Plaintiff's federal claims of sexual harassment and retaliation and her other state law claims. The Clerk is also directed to terminate all pending motions and close this case.