Bridgette FREDERICK, Plaintiff-Appellant,

v.

SPRINT/UNITED MANAGEMENT COMPANY & Sprint Communications Company, L.P., Defendants-Appellees.

No. 99-13958.

United States Court of Appeals,

Eleventh Circuit.

April 4, 2001.

Appeals from the United States District Court for the Northern District of Georgia. (No. 96-02170-CV-JEC-1), Julie E. Carnes, Judge.

Before CARNES and BARKETT, Circuit Judges, and POLLAK[*], District Judge.

BARKETT, Circuit Judge:

Bridgette Frederick appeals from a summary judgment order entered in favor of her employer, Sprint/United Management Company and the Sprint Communications Company (collectively "Sprint"), on her Title VII sexual harassment claim.

I.    BACKGROUND

On review of a summary judgment order, the court must consider all of the parties' evidence, and view it in the light most favorable to the non-moving party's claims.  Therefore, the following account is drawn from the parties' deposition testimony and supporting materials, viewed in the light most favorable to Frederick's allegations.  Frederick began work at Sprint as a permanent employee in August 1988.  In 1992, she was transferred to the Call Before You Dig Department ("CBYD") and was assigned to supervisor Ralph Moore.  Frederick testified that while working at CBYD, Moore subjected her to a range of discomforting behaviors.  Specifically, Moore would stare at her for prolonged periods, look her up and down, and blow kisses at her.  He also visited Frederick's work station several times a day, conversing with her up to 15 to 20 minutes at a time.  While at her work station, he would lean over her at her computer and rub his face and hair against her jaw;  on one occasion he kissed her on the cheek.  Additionally, Moore touched Frederick's breasts while standing over her, ostensibly assisting her in typing on her computer.  Frederick testified that Moore's sexual harassment continued throughout her pregnancy.  Specifically, Moore made comments about

[*]Honorable Louis H. Pollak, U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

how her pregnancy had likely decreased her sexual desirability in her husband's eyes, and he stated that "they should do this" but her "organs were going to take a long time to get back in place."

Soon after Frederick began working at CBYD, she filled out several transfer request forms. Moore was required to sign these forms and forward them to Sprint's Human Resources Department ("Human Resources") for processing. Human Resources, however, never acted on Frederick's transfer requests. Frederick also testified that she never followed up with Moore about what action was being taken regarding her requests for a transfer. Also, after six months at CBYD, Frederick petitioned Moore for a promotion, seeking to move from her current "Coordinator I" position to a "Coordinator II" position. Frederick attested that she was qualified for the promotion and that it should have been granted automatically; however, Moore denied her request, telling her that she "needed to do more things." When Frederick asked Moore what additional tasks she needed to perform, Moore told her that she already knew and he asked her to leave his office. Taken in combination with what she perceived to be Moore's overtly sexual behavior, Frederick perceived Moore's comment to be a demand for sex in return for the promotion.

Sprint offered evidence to show that it had an established sexual harassment policy with reasonable complaint procedures. First, Sprint offered a publication called "The Employee Resource: A Guide to Human Resource Policy," which it contends was distributed after December 1990 to all employees, and was posted throughout Sprint's offices ("1990 Policy"). The 1990 Policy defines sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical contact that is sexually offensive." The 1990 Policy also indicates that employees are to "report sexual harassment ... to their supervisors and/or Human Resources immediately."

Next, Sprint presented "Sprint's Code of Ethics," (the "Code"), a twenty-page booklet which describes a broad range of employee misconduct. Two lines in the Code refer to sexual harassment complaints. Specifically, the Code states, "[i]t is our policy, in accordance with the law, to maintain an environment free from discrimination on the basis of sex, race ... or disability. Sexual harassment is both illegal and unethical and it should be reported immediately." The Code further provides that "any questions" about incidents arising under the Code should be reported to one's "supervisor, who in turn will work with Human Resources, the Law Department, or the Chief Ethics Office, to get an answer." The Code last indicates that an employee can anonymously call the Sprint Ethics Code Hotline with her questions.

Sprint also presented a booklet that was copyrighted in 1994, entitled "Sexual Harassment," which provides a more detailed account of the company's sexual harassment policies ("1994 Policy"). The 1994

Policy describes a range of behaviors that can be categorized as sexual harassment, and advises an employee who has been sexually harassed to "report the incident to [her] supervisor, the next level of management, [her] local Employee Relations or Human Resources representative, or to another member of management with whom [she is] comfortable." Vince Goodwine, the Sprint employee responsible for handling employees' complaints in Frederick's division, testified that it was his impression that the 1994 Policy simply was "a recommunication" of the existing 1990 sexual harassment policy, and that Sprint had long required that a low level manager who received a sexual harassment complaint should report that complaint to persons in higher levels of management.

Frederick testified that she retained all of the Human Resources materials she received when she began working at Sprint, and she did not recall having received the 1990 Policy. She also testified that the 1990 Policy was not posted on her floor during the period she allegedly was subject to harassment. Frederick further stated that she had received the Code and recognized that it applied to her sexual harassment claim, but that she did not understand how to file a complaint under the Code. Frederick last indicated that she did not receive the 1994 Policy until she went to Human Resources in 1994 to request a copy.

Frederick also testified about her attempts to report Moore's behavior. Specifically, Frederick indicated that she never complained to Moore, the various departments listed in the Code, or called Sprint's Ethics Code Hotline. However in 1993, Frederick and a temporary employee met with Denise Pough, a supervisor in Sprint's customer service department, to discuss Moore's sexually harassing behavior. Pough took no action on Frederick's complaint; however, Frederick recalls that Pough may have told her to report her complaint to Human Resources. Subsequently, Frederick and the temporary worker met for lunch with Andre Weathersby, a supervisor in Sprint's Service Management Center, and complained about Moore's sexually harassing behavior. Frederick testified that Weathersby advised her, and the complaining temporary worker, not to lodge complaints about Moore with Human Resources or with other managers, and that they should not retain counsel to pursue their complaints. Weathersby contends that this conversation never occurred.

Some time later, in 1994, Goodwine learned from Sprint employee Brava Henson that Moore was allegedly harassing a female subordinate. In August 1994, Goodwine conducted an investigation of Moore, and he approached Frederick and many other Sprint employees for interviews. During Frederick's interview, on August 15, 1994, she informed Goodwine about Moore's harassing behavior. When Goodwine concluded his investigation two weeks later, on August 29, 1994, Sprint terminated Moore for inappropriate conduct.

Nine months later, Frederick received her promotion to Coordinator II.

Frederick filed suit in July 1996, raising both "hostile environment" and "*quid pro quo*"claims; she alleged that Sprint was liable for Moore's harassment because Pough and Weathersby failed to timely act once she told them about the harassment. The district court granted Sprint summary judgment on Frederick's claim in 1997, but a panel of this Court vacated that judgment and remanded the case for reconsideration in light of the Supreme Court's decisions in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). On reconsideration, the district court again granted summary judgment to Sprint, on both of Frederick's claims. This appeal followed.

II.    STANDARD OF REVIEW

We review a district court order granting summary judgment *de novo,* and view all of the facts in the record in the light most favorable to the non-moving party, and draw all inferences in her favor. *See Arrington v. Cobb County,* 139 F.3d 865, 871 (11th Cir.1998) (citing Fed.R.Civ.P. 56(c)). The Court, however, will not make credibility determinations, nor weigh the parties' evidence. *See Stewart v. Booker T. Washington Ins.,* 232 F.3d 844, 848 (11th Cir.2000). Summary judgment is only proper if there are no genuine disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. *See id.*

III.    DISCUSSION

In *Ellerth* and *Faragher,* the Supreme Court indicated that courts should no longer use the labels "*quid pro quo* " and "hostile environment" to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's sex-based harassment. *Ellerth,* 524 U.S. at 753, 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275 (applying new standard).[1] Instead, when analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions.

---

[1]In *Ellerth,* the Supreme Court explains that the terms "*quid pro quo*"and "hostile environment" are still helpful for distinguishing between cases in which an supervisor carries out his threat to sanction an employee if she does not submit to his sexual demands ("*quid pro quo*") and circumstances in which the supervisor does not carry through on his threats ("hostile environment."). *Ellerth,* 524 U.S. at 751-53, 118 S.Ct. 2257.

*Ellerth,* 524 U.S. at 761-63, 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 790, 807, 118 S.Ct. 2275; *see also Johnson v. Booker T. Washington Broadcasting Serv., Inc.,* 234 F.3d 501, 508 (11th Cir.2000) (recognizing shift in terminology). Under this analysis, when a supervisor engages in harassment which results in an adverse "tangible employment action" against the employee, the employer is automatically held vicariously liable for the harassment. *Ellerth,* 524 U.S. at 763, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 790, 118 S.Ct. 2275. In contrast, when the supervisor's harassment involves no adverse "tangible employment action," an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the *Faragher* and *Ellerth* cases (*Faragher/Ellerth* affirmative defense). *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. Therefore, although Frederick has styled this action using the old Title VII categories, we treat her "*quid pro quo*" claim as an adverse "tangible employment action" claim, and her "hostile environment" claim as one in which no adverse "tangible employment action" occurred.

A. *Adverse Tangible Employment Action Claim*

Frederick's adverse "tangible employment action" claim is based on her allegation that Moore refused to promote her to Coordinator II because she would not grant his request for sexual favors. The district court determined that Frederick failed to provide sufficient evidence to establish a prima facie case on this claim. After making its finding, the district court stated:

> [H]ad Moore been attempting to signal to plaintiff that she needed to perform some sexual act in order to receive a promotion, one would reasonably conclude that he might have tried to communicate more clearly that particular job requirement; ambiguity is rarely a trait of the quid pro quo seducer.

This statement, however, contradicts a long line of cases showing that sexual asides and insinuations are the well-worn tools of a sexual harasser. *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 19, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (discussing supervisor's claim that he was only joking when he suggested to plaintiff that they "go to the Holiday Inn to negotiate" her raise); *Jansen v. Packaging Corp. of America,* 123 F.3d 490, 503 (7th Cir.1997), *aff'd sub nom., Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (finding that plaintiff had an actionable *quid pro quo* claim when her supervisor told her that he had some hesitation about promoting her because she was "not loose enough for him"). These cases show that a supervisor may simply intimate that a subordinate's career prospects will suffer if she does not submit to his advances, with the hope of concealing his harassment if his statements are repeated to a third party. Therefore, we take this opportunity to reaffirm the longstanding rule in this Circuit, that a victim need not provide evidence of a

direct and express sexual demand to make a claim under the "tangible employment action" analysis. *See, e.g., Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1246 (11th Cir.1998) (explaining that one can establish a tangible employment action claim with less than direct statements which allow "inferences [to be] drawn from the observable facts.").

We nonetheless affirm the district court's grant of summary judgment on Frederick's adverse "tangible employment action" claim.  Even under the summary judgment standard, which requires that the Court construe all inferences in Frederick's favor, Frederick failed to present sufficient evidence to establish any causal link between the adverse "tangible employment action" she suffered and the alleged harassment. At summary judgment, the only evidence Frederick offered on this point was her own testimony that she was qualified for the Coordinator II position and was denied the promotion.  This testimony provided insufficient basis to survive a motion for summary judgment because Sprint presented unrebutted evidence showing that it had denied Frederick the promotion for reasons independent of her qualifications, namely, that she had a history of attendance problems.  Also the record suggests that Frederick's supervisors after Moore perceived that she needed more development before advancing to Coordinator II, as they did not promote her for an additional nine months after Moore was terminated.  In light of the unrebutted evidence showing that Frederick was denied the promotion to Coordinator II on grounds independent of the alleged harassment, we affirm the district court's determination that Sprint was entitled to summary judgment on Frederick's adverse "tangible employment action" claim.

### B. *No Adverse Tangible Employment Action Claim*

Frederick also claims that the district court erred in awarding Sprint summary judgment on her hostile environment claim, where no adverse "tangible employment action" occurred but Moore's harassment was sufficient to constructively alter her experience of workplace conditions.  *Ellerth,* 524 U.S. at 752-53, 118 S.Ct. 2257;  *Faragher,* 524 U.S. at 787-88, 118 S.Ct. 2275.  For the purposes of the summary judgment motion, the district court assumed, without deciding, that Frederick's allegations sufficed to establish sexual harassment, but that Sprint was entitled to summary judgment on the *Faragher/Ellerth* affirmative defense. We likewise make the same assumption when we address Frederick's argument that the district court erred in finding that Sprint satisfied its burden on its affirmative defense.

### 1. *General Principles of the* <u>*Faragher/Ellerth*</u> *Affirmative Defense*

In order to prevail on a claim of sexual harassment when no adverse "tangible employment action"

is taken, a plaintiff must present sufficient evidence to show that the harassment she suffered, objectively and subjectively, was severe or pervasive. *See Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 582-83 (11th Cir.2000). If the plaintiff satisfies her burden, the defendant-employer is entitled to assert the *Faragher/Ellerth* affirmative defense. *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. The "defense comprises two necessary elements: (1) that the employer exercised reasonable care to prevent and promptly correct harassing behavior *and* (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275 (emphasis added); *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257 (same). Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements. *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

The Supreme Court's description of the *Faragher/Ellerth* affirmative defense is instructive, and we quote it at length to ensure that the rebuttable presumptions described therein are properly applied. In *Faragher* and *Ellerth,* the Supreme Court explains that:

> proof that an employer ha[s] promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law[; however,] the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. Examples of the case law in this area help clarify the *Faragher/Ellerth* framework.

For example, as to the first part of the first element of the *Faragher/Ellerth* affirmative defense, an employer does not always have to show that it has a formal sexual harassment policy to meet its burden of proof on this element. *See Lissau v. Southern Food Serv.,* 159 F.3d 177, 183 (4th Cir.1998) (recognizing that small employers may show that they exercised reasonable care to prevent and correct sexual harassment through more informal complaint mechanisms). At the same time, an employer's showing that it has a sexual harassment policy does not automatically satisfy its burden. *See, e.g., Faragher,* 524 U.S. at 808, 118 S.Ct. 2275 (denying an employer the affirmative defense because although it had a sexual harassment policy it had "entirely failed to disseminate [that] policy"). As to the second part of the first element of the *Faragher/Ellerth* affirmative defense, an employer need not act instantaneously, but must act in a reasonably

prompt manner to respond to the employee's complaint. *Madray v. Publix Supermarkets Inc.,* 208 F.3d 1290, 1302 (11th Cir.2000).

As to the second element of the defense, an employer's showing that the plaintiff-employee failed to follow its complaint procedures will often be sufficient satisfy its burden. *See, e.g., Madray,* 208 F.3d at 1302 (explaining that amorphous complaints to persons not authorized to accept complaints constituted evidence that the employee unreasonably failed to take advantage of her employer's complaint procedures); *Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1365 (11th Cir.1999) (same). However, in some cases, the proof will show that the employee's non-compliance was reasonable under the circumstances and, in these cases, the defendant cannot satisfy the second element of the affirmative defense.

2. *Application of the Faragher/Ellerth Affirmative Defense in this Case*

a. *Reasonable Care to Prevent and Correct Harassment*

The first element of the *Faragher/Ellerth* affirmative defense requires that an employer demonstrate that it took reasonable care both to prevent *and* correct harassment. The district court found that Sprint satisfied its burden to show that it took steps to prevent and correct the alleged harassment because Sprint presented the district court with the 1990 Policy and the Code, and indicated that it investigated Frederick's complaint in accordance with these policies. However, in order to establish that it took reasonable steps to prevent harassment, Sprint was required to show that its sexual harassment policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect. *See Madray,* 208 F.3d at 1298-99; *cf. Faragher,* 524 U.S. at 808, 118 S.Ct. 2275 (denying an employer the affirmative defense because the employer had "entirely failed to disseminate its polic[ies]," the policies did not contain reasonable complaint procedures, and because the employer failed to supervise management personnel). Moreover, to establish that it took proper action to correct the harassment, Sprint was required to show that it acted reasonably promptly on Frederick's complaint when it was given proper notice of her allegations as required under its complaint procedures. *See Madray,* 208 F.3d at 1299 -1300; *Breda v. Wolf Camera & Video,* 222 F.3d 886, 889 (11th Cir.2000). In this case, although it was undisputed that Sprint had a sexual harassment policy, there were material issues of disputed fact regarding what Sprint's complaint procedures were during the relevant period.

Specifically, the evidence at summary judgment showed that there were disputes about what Sprint's sexual harassment complaint procedures were between 1992 and 1994, when the harassment Frederick

complains of allegedly occurred. Sprint contends that only the 1990 Policy and the Code were in effect during this period, and therefore employees were required to report their allegations to "their supervisors," the Human Resources Department, the Chief Ethics Officer, or the Sprint Ethics Code Hotline. Sprint also contends that the word "supervisors" refers to employees' direct supervisors. However, in direct contravention of this position, Sprint's Human Resources representative, Goodwine, testified that the 1994 Policy was functionally effective during 1992-1994, as the 1994 Policy merely "recommunicated" Sprint's 1990 sexual harassment policy. This issue is material because the 1994 Policy does not limit an employee to complaining to a direct supervisor, but allows the employee to report her sexual harassment allegations to anyone "in a management position with whom [she] feels comfortable." Thus the fact finder must address the first part of the first element of the *Faragher/Ellerth* affirmative defense, whether the employer had a reasonable policy to prevent harassment and what that policy was.

Moreover, as indicated above, the question of whether an employer timely acted to correct harassment turns on when it had proper notice of an employee's harassment complaint. *See Madray,* 208 F.3d at 1299; *Coates,* 164 F.3d at 1366; *Breda,* 222 F.3d at 889. Since the evidence showing what Sprint's policies were between 1992 and 1994 is in conflict, only the fact finder can determine what date should be used to decide if Sprint timely acted on Frederick's complaint. If Sprint's interpretation of the Code and the 1990 Policy is correct, then Sprint learned of Frederick's complaint on August, 15, 1994, in the course of her interview with Goodwine, and Sprint timely responded by investigating her complaint, an investigation which in this case resulted in Moore's termination two weeks later. If Goodwine's interpretation of these materials controls, then Frederick's complaint to Pough in 1993, if the jury finds that it happened, establishes that Sprint had constructive notice of Frederick's complaint for one year before it took any action.

We also recognize that there are disputed issues of material fact about whether Sprint's sexual harassment policies were effectively published. *See Madray,* 208 F.3d at 1298. The summary judgment standard required that the district court credit Frederick's testimony, and Frederick identified a number of defects in the publication of the policy. Specifically, Frederick attested that she never received the 1990 Policy and that it was not posted in her section of Sprint's offices. She also testified that she received the Code, but alleged that the Code was unclear about how to file a sexual harassment complaint. Last, Frederick testified that she did not receive the 1994 Policy until she went to Human Resources in 1994 and requested a copy. Instead of crediting her version of events, the district court assumed that Sprint's sexual harassment

policies were properly published. Thus, since there were multiple issues of disputed fact about what Sprint's complaint procedures were during the relevant period, and whether it properly published its policies, the record was insufficient to establish that Sprint satisfied its burden on the first element of the *Faragher/Ellerth* affirmative defense, to show that it took reasonable care to prevent and/or to correct harassment.

b. *Reasonable Care to Avoid Harassment*

The second element of the *Faragher/ Ellerth* affirmative defense requires that Sprint show that Frederick unreasonably failed to take advantage of Sprint's complaint procedures or otherwise avoid harm. *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. Sprint presented evidence showing that Frederick complained to Pough and Weathersby instead of following the instructions in the Code or the 1990 Policy, and the district court determined that this proof satisfied Sprint's burden to show that Frederick unreasonably failed to use her employer's complaint procedures. However, the factual disputes about the interpretation of Sprint's policies precluded the district court from making a determination on this element as well. *See Breda,* 222 F.3d at 890 (explaining that the question of whether an employee followed the procedures established in the company's policy in a reasonable manner is an issue of fact to be determined by a jury). Again, the record cannot conclusively establish whether Frederick reasonably complied with Sprint's complaint procedures because this issue turns on whether we interpret the 1990 Policy and the Code standing alone, or in relation to the 1994 Policy. If only the 1990 Policy and the Code are considered, then Frederick's complaints to Pough and Weathersby could be interpreted as non-compliance with Sprint's complaint procedures, and unless there was other evidence justifying Frederick's decision, Sprint's evidence would have satisfied its burden on the second half of the *Faragher/Ellerth* affirmative defense. However, if the 1994 Policy is treated as an elaboration on the 1990 Policy and the Code, then Frederick's complaints to Pough and Weathersby would be sufficient to show that she exercised reasonable care to avoid harassment. Since the finding on the second element of the *Faragher/Ellerth* affirmative defense also depends on disputed issues of material fact, the district court erred in concluding that Sprint made a successful showing on this element as well.

In addition to the disputed facts regarding the policy materials, the record contains factual disputes about whether there were extenuating circumstances that might explain why Frederick failed to timely use the complaint procedures identified in the 1990 Policy and the Code. *See Greene v. Dalton,* 164 F.3d 671, 674-75 (D.C.Cir.1999) (explaining that the district court invaded the province of the jury in awarding

summary judgment to the defendant when the defendant had not demonstrated that the employee's delay in filing a complaint was unreasonable). For one, Frederick contends that she never received the 1990 Policy and that it was unclear about how to report her complaint under the Code, and this prevented her from reporting her complaint in a timely fashion. Also, Frederick argues that she did not timely report her complaint in accordance with these policies because Weathersby told her not to pursue her complaint. Weathersby, in contrast, claims that this conversation never occurred. Importantly, the facts relevant to Frederick's conversation with Weathersby turn on assessments of witness credibility, which by definition cannot be resolved at summary judgment. Of course if the jury determines that Weathersby did dissuade Frederick from filing her complaint, it will have to determine whether she took reasonable steps to avoid the harassment prior to her report to Weathersby. In short, there are two issues of disputed fact that could explain why Frederick did not timely file a complaint under the 1990 Policy and the Code, and therefore the district court erred in finding that Sprint established that Frederick had, without justification, failed to use Sprint's complaint procedures.

IV. CONCLUSION

In summary, because the facts in the record support several different interpretations that could prevent Sprint from establishing either or both elements of the *Faragher/Ellerth* affirmative defense, we hold that the district court erred in awarding Sprint summary judgment on Frederick's "no adverse tangible employment action" claim. We thus reverse and remand on Frederick's "no adverse tangible employment action" claim for proceedings to determine all issues regarding this claim.

AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART.