**Sandra SPEAKS, Plaintiff,**

v.

**CITY OF LAKELAND and Michael Chin, Defendants.**

**No. 8:02–CV1833T30MSS.**

United States District Court,
M.D. Florida,
Tampa Division.

April 21, 2004.

**1220**

Robert H. Grizzard, II, Law Office of Robert H. Grizzard, II, Lakeland, FL, for Sandra Speaks, plaintiff.

Cristina Arechaga Equi, Gray Robinson, P.A., Orlando, FL, Mark Nelson Miller, Gray, Harris & Robinson, P.A., Lakeland, Sean R. Parker, Boswell & Dunlap, LLP, Bartow, FL, for City of Lakeland, a Florida municipality, Michael Chin, Officer of the Lakeland Police Department, defendants.

## ORDER

MOODY, District Judge.

THIS CAUSE comes before this Court upon Defendant City of Lakeland's Motion for Summary Judgment (Dkt.# 54) and Plaintiff's response (Dkt.# 61) thereto.[1] After close consideration, this Court concludes that summary judgment should be granted.

## I. BACKGROUND

This is an employment discrimination action against the City of Lakeland (the "City"). From September 15, 1997, through June 15, 2001, the City employed Plaintiff as a Public Safety Aide ("PSA") for the Lakeland Police Department (the "Department").[2] Beginning in May or June 2000, Sergeant Michael Chin made sexual advances toward Plaintiff. At the time, Plaintiff was not assigned to Chin's squad, but acquiesced to Chin's advances and had sexual intercourse with him. Soon thereafter, Plaintiff requested a transfer to Chin's squad despite the unwanted sexual advances because Plaintiff did not get along with her previous supervisor.[3] Not knowing of the sexual relationship between Chin and Plaintiff, the Department granted Plaintiff's request and transferred her to be under the direct supervision of Chin. He directly supervised Plaintiff for the remaining time she was on duty as a PSA.

According to the Plaintiff, Chin continued to demand sexual intercourse and other sexual acts from Plaintiff. These demands occurred both while Plaintiff and Chin were on duty and sometimes when one or the other was off duty.[4] Plaintiff asserts that she continued to acquiesce because she feared Chin harming her and also feared being fired or transferred.

On June 14, 2001, Plaintiff and Chin got into an argument. While Plaintiff was away from her desk, Chin placed a note on her desk threatening to transfer her back to her former squad to be supervised by the supervisor that she did not like. The note upset Plaintiff. After she went home that night, Plaintiff told her husband about Chin's sexual advances toward and sexual activities with her.[5] At approximately midnight on June 14, 2001, Plaintiff's hus-

---

1. Plaintiff previously settled her claim against Defendant Michael Chin and voluntarily dismissed the count against him.

2. A PSA is a non-sworn employee of the Department that handles "not-in-progress calls." PSAs do not have arrest powers and do not carry a gun.

3. The City was divided geographically into four squads. At the time of transfer, Plaintiff could have transferred to a squad other than Chin's squad and avoided Chin.

4. Chin and Plaintiff disagree on the number of instances that they engaged in sexual intercourse and acts.

5. Plaintiff's husband had previously confronted Plaintiff about some strange numbers on her pager. Plaintiff had told her husband

band went to the Department and reported Chin's misconduct.

Plaintiff's husband's complaint was the first notice the Department and the City had of Plaintiff's and Chin's inappropriate sexual relationship. On June 15, 2001, the Department, through its Internal Affairs unit, began an investigation. The two investigating officers conducted eighteen interviews and collected physical evidence from the locations where Plaintiff and Chin engaged in sexual activities. While the investigation was ongoing, the City allowed Plaintiff to remain at home with full pay.[6]

On August 23, 2001, the investigation concluded. The Department determined that Plaintiff and Chin had engaged in an inappropriate consensual sexual relationship. But, the Department also concluded that there was insufficient evidence that the sexual relationship was "unwelcome." Therefore, the Department concluded that Plaintiff's and Chin's relationship did not meet the definition of "wrongful sexual conduct" as defined in the City's "Unlawful Employment Harassment" policy. The Department demoted Chin from the rank of Sergeant to Patrol Officer, transferred him to night duty with a different unit in the Department,[7] and suspended him for two weeks without pay.[8]

At the same time, the City offered Plaintiff the opportunity to return to work as a PSA. Plaintiff did not want to return to her former job and, prior to the investigation concluding on July 31, 2001, requested in writing to be transferred to another City agency.[9] Plaintiff stated that the request was "due to the torment of going back to the place where some of the incidents occurred and not knowing if my safety was guaranteed or not. I would have been in the same building as the person whom (sic) done (sic) this as well as the place some of these incidents occurred." After the investigation concluded, the Chief of Police and the City's Employee Relations Director met to discuss Plaintiff's employment with the City. At that meeting, Plaintiff requested to be transferred to an open position in the Criminal Investigations Section within the Department assembling information on child abuse crimes. The Chief of Police had concerns about transferring Plaintiff to that job because of Plaintiff's previous statements about returning to the Department and her prior personal history with child abuse.[10] And, because of budgetary concerns, he was not sure he was going to fill the position at all.[11]

Plaintiff then asked if the City had another position available. The City's Employee Relations Director offered her a job as a customer representative with the elec-

---

that the numbers were nothing to worry about.

6. On June 18, 2001, the Department gave Plaintiff a choice of working in another area where she would not have contact with Chin or staying at home with full pay.

7. The Department transferred Chin so that Plaintiff would not have to transfer when she returned to work.

8. In addition, by internal memorandum, the Chief of Police indicated that Chin should not be allowed to supervise any employees. In the sanctions letter from the Chief of Police, the

Chief indicated that the reason he was not terminating Chin was because of his clean service record and length of service (twenty-two years) to the Department.

9. She had made an oral request to transfer to another city department at a June 18, 2001 meeting with the Chief and Deputy Chief of Police.

10. Plaintiff disclosed to the Chief that one of her children had been murdered as the result of child abuse.

11. The Chief has still not filled the position in the Criminal Investigation Section.

tric department at the same pay rate and benefits as a PSA. Plaintiff accepted that position and was to report to work on September 4, 2001.

On September 4, 2001, Plaintiff failed to report for work at the electric department. Instead, in September and October 2001, Plaintiff again requested to be transferred to the Criminal Investigations Section and submitted a letter from her mental health counselor/therapist stating that she was able to work in the Criminal Investigations Section.[12] In her request, Plaintiff indicated that her transfer was causing her to suffer a pay cut because PSAs were likely to receive a pay increase in the future.

The City did not terminate the Plaintiff for not reporting to work at the electric department and actually continued to pay her despite her not working. During this time, the Chief of Police asked the City's psychologist to review the internal affairs investigation file and Plaintiff's mental health history and therapy records. The City's psychologist concluded that Plaintiff should be transferred away from the Department. On October 23, 2001, the Chief of Police again wrote Plaintiff stating that Plaintiff had accepted a position with the electric department and he was not filling the Criminal Investigations Section position.

On November 9, 2001, Plaintiff filed her EEOC charge. Shortly thereafter, Plaintiff began working at the electric department and worked at the department until May 2002. On May 16, 2002, Plaintiff resigned from the electric department "due to health issues, both physical and mental." Plaintiff resigned after a uniformed police officer came into the billing area at the electric department, causing Plaintiff to have a nervous breakdown. Plaintiff is currently receiving short-term disability benefits from the City and has applied for long-term disability benefits.

At all relevant times, the City had a sexual harassment policy. Plaintiff and every City employee were provided a copy of the policy as part of the personnel manual at the time of their employment with the City. The policy contains a reporting procedure for a victim of sexual harassment. In addition, the Department has a general order against sexual harassment contained in General Order 4–4, which provides a reporting procedure similar to the City's policy.[13] Plaintiff was unaware of either policy. Chin was aware of the policies and actually had attended training on sexual harassment prior to the incidents in this case.

■ On October 9, 2002, Plaintiff filed this action. In her third amended complaint, Plaintiff alleges that the City: (1) negligently retained Chin; (2) violated Title VII by allowing her to be sexually harassed by her supervisor and retaliating against her; (3) violated the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.* ("FCRA") by allowing her to be sexually harassed by her supervisor and retaliating against her;[14] and (4) is vicariously liable for Chin's assault and battery of Plaintiff.[15]

---

12. Plaintiff admitted in her deposition that she really did not want to work in the Department because Chin was still employed there.

13. There appears to be a dispute on whether the sexual harassment policy was posted and whether employees received training when they became employed with the City.

14. Since the FCRA essentially mirrors Title VII, Florida courts look to federal case law construing Title VII. *See Byrd v. Richardson–Greenshields Securities, Inc.,* 552 So.2d 1099, 1102 (Fla.1989); *Fla. Dep't of Community Affairs v. Bryant,* 586 So.2d 1205 (Fla. 1st DCA 1991); *also Resley v. Ritz–Carlton Hotel Co.,* 989 F.Supp. 1442, 1446–47 (M.D.Fla.1997) (construing Title VII and FCRA together).

15. Count V of the third amended complaint was against Chin alone. Plaintiff voluntarily dismissed that claim.

On February 27, 2004, the City filed a motion for summary judgment on all of Plaintiff's claims.

## II. SUMMARY JUDGMENT STANDARD

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *See id.* Throughout this analysis, the district court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in her favor. *See id.* at 255, 106 S.Ct. 2505.

## III. DISCUSSION

### A. PLAINTIFF'S SEXUAL HARASSMENT CLAIMS

Plaintiff claims that she was subject to *quid pro quo* sexual harassment by her supervisor, Chin, and the City should be vicariously liable for that harassment. This is an unusual case in that the sexual relationship between Plaintiff and Chin began· at a time when Chin was neither Plaintiff's supervisor nor in her direct chain of command. And, she voluntarily transferred under his supervision after the relationship began. In spite of this, for purposes of summary judgment, the City assumes, as does this Court, that Chin's misconduct constituted sexual harassment. The City argues that it is not vicariously liable for that sexual harassment because no tangible employment action was taken and the City meets the *Faragher/Ellerth* affirmative defense.[16]

■ In *Walton v. Johnson & Johnson Services, Inc.*, the Eleventh Circuit reiterated the standard that governs the vicarious liability of employers for the harassing conduct of supervising employees. 347 F.3d 1272, 1280–81 (11th Cir.2003) (quoting *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1311 (11th Cir.2001)). The court stated that " 'courts should no longer use labels "quid pro quo" and "hostile environment" to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's sex-based harassment.' "[17] *Id.* at 1280. Instead, the

---

**16.** The affirmative defense comes from two sexual harassment opinions of the Supreme Court in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

**17.** Indeed, the quote from the Eleventh Circuit is based directly on the Supreme Court's opinion in *Ellerth*, 524 U.S. at 753, 118 S.Ct. 2257. In *Ellerth*, the Court commented that previous decisions on vicarious liability encouraged Title VII plaintiffs to state *quid pro quo* claims because such claims equated to

vicarious liability. *See id.* at 753, 118 S.Ct. 2257. According to the Supreme Court, the terms *quid pro quo* and hostile work environment remain relevant to the threshold question of whether Plaintiff can prove discrimination in violation of Title VII. *See id.* at 753–54, 118 S.Ct. 2257. However, the terms are irrelevant when it comes to whether an employer is vicariously liable. *See id.* at 754, 118 S.Ct. 2257 (stating whether "tangible employment action" occurs and not the category of sexual harassment, *quid pro quo* or hostile work environment, control the issue of vicarious liability).

Eleventh Circuit stated that courts should separate sexual harassment cases into two groups: (1) cases where a "tangible employment action" was taken because of an agent's misuse of authority; and (2) cases where there was no "tangible employment action" taken. *See id.* An employer is automatically liable for sexual harassment cases falling into the first group, but, for the second group, the employer may raise the *Faragher/Ellerth* affirmative defense. *See id.* at 1280–81.

## 1. Tangible Employment Action Because Of An Agent's Misuse Of Authority

■ The first question then is whether Plaintiff suffered a "tangible employment action" because of an agent's misuse of authority. "Tangible employment action" is more than actionable harassment. It is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change of benefits.... A tangible employment action in most cases inflicts direct economic harm." *See Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761–62, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Plaintiff argues that she suffered such a tangible employment action because Chin used his supervisory authority (including threats of termination or transfer) to ob-

tain Plaintiff's consent to engage in sexual activities. In other words under Plaintiff's theory, an employer is automatically liable if the harassment is *quid pro quo* harassment. While Plaintiff does not claim that she was constructively discharged from her job, Plaintiff relies on the conduct in *Suders v. Easton,* to argue that the City should be vicariously liable to Plaintiff and not be entitled to assert a *Faragher/Ellerth* affirmative defense.[18] 325 F.3d 432, 461–62 (3rd Cir.2003).

*Suders* involved an employee who was subject to "several instances of namecalling, repeated episodes of explicit sexual gesturing, obscene and offensive sexual conversation, and the posting of vulgar images." *See id.* at 435. The Third Circuit held that a constructive discharge constituted a tangible employment action and if a jury found a constructive discharge, an employer would not be entitled to assert a *Faragher/Ellerth* affirmative defense.[19] *See id.* at 461–62.

A more illustrative example of Plaintiff's argument is contained in *Jin v. Metropolitan Life Insurance Co.,* 310 F.3d 84 (2d Cir.2002). *Jin* involved an employee whose supervisor demanded sexual acts from the employee as a condition of her continued employment. *See id.* at 88–89. At trial, the district court defined "tangible employment action" as an economic harm to the employee. *See id.* at 93. The Second Circuit reversed, holding that requir-

---

**18.** Plaintiff's argument misses the mark, because under *Faragher/Ellerth* it is not the category or the nature of the harassment that automatically creates vicarious liability. Instead, it is whether a "tangible employment action" occurred.

**19.** In *Walton,* the Eleventh Circuit explicitly avoided ruling on whether a constructive discharge could constitute a "tangible employment action" under *Faragher/Ellerth* analysis. 347 F.3d at 1283 n. 9. This Court does not reach the question of whether a constructive discharge is a "tangible employment action"

because Plaintiff disclaims that she is asserting such a claim. Even if this Court reached whether Plaintiff was constructively discharged when she resigned from the electric department, this Court would conclude that Plaintiff was not constructively discharged because she failed to give the City or the Department sufficient notice and time to remedy the situation. *See Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 754 (11th Cir.1996); *also Mangrum v. Republic Industries, Inc.,* 260 F.Supp.2d 1229, 1252 (N.D.Ga.2003); *Jones v. USA Petroleum Corp.,* 20 F.Supp.2d 1379, 1383 (S.D.Ga.1998).

ing an employee to engage in unwanted sexual acts "fits squarely within the definition of 'tangible employment action' that the Supreme Court announced in *Faragher* and *Ellerth.*" *Id.* at 94 (emphasis in original). In reaching its conclusion, the Second Circuit reasoned that the employer's empowerment of the supervisor enabled the supervisor to force the employee to submit to his sexual abuse. *See id.* According to the Second Circuit, the employee received a tangible job benefit—continued employment—by submitting to the sexual abuse and that benefit was sufficient to be a "tangible employment action." *See id.* at 94–95.

There are two problems with the Second Circuit's (and Plaintiff's) argument: (1) it is inconsistent with Supreme Court precedent and appears to be a return to the pre-*Faragher/Ellerth* state of sexual harassment law where the category of harassment determined vicarious liability; and (2) it undermines the concept of an employee having a coordinate duty to avoid harm. Turning first to the Supreme Court precedent, the Supreme Court clearly held in *Ellerth* that labels, such as *quid pro quo*, were irrelevant to whether an employer was vicariously liable for the conduct of a supervisor.[20] 524 U.S. at 753–54, 118 S.Ct. 2257. The Court reasoned that by creating a rule of automatic liability based on the category of harassment the courts of appeal had caused plaintiffs to try to squeeze their claims into the *quid pro quo* category and expand that category's definition. *See id.* at 753, 118 S.Ct.

2257. Instead, the new standard, as enunciated by the Supreme Court, concentrated on whether a "tangible employment action" occurred. *See id.* at 765, 118 S.Ct. 2257.

Additionally, the Second Circuit's (and the Plaintiff's) argument is contrary to Supreme Court precedent because a "tangible employment action" is limited to where "*a* significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change of benefits" occurs. *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257 (emphasis added). This Court agrees with the Second Circuit that the examples provided in *Ellerth* are not exclusive and other forms of "tangible employment action" exist. *See Jin,* 310 F.3d at 93. This Court also agrees that the Supreme Court did not limit "tangible employment action" to strictly economic harm. *See id.* at 97. However, this Court disagrees with the Second Circuit that maintenance of the status quo, an employee keeping his/her job, is sufficient to automatically create vicarious liability. *Ellerth* requires a "significant change in status" and continuing to work with the same job, pay, benefits, and responsibilities is not a change in status and is not analogous to any of the examples provided by the Court in *Ellerth* or *Faragher.*

The Plaintiff's (and the Second Circuit's) argument is also inconsistent with Eleventh Circuit precedent.[21] *See Walton,* 347

---

**20.** The Second Circuit in *Jin* is correct that *Ellerth* was a hostile environment case and not a *quid pro quo* submission case. *310 F.3d* at 96–97. However, this Court disagrees that the *Ellerth* opinion suggests a different vicarious liability standard applies in a submission *quid pro quo* case. Indeed, the Court's comments about the *Faragher/Ellerth* factors and not the categories of harassment being relevant to the vicarious liability inquiry suggest the opposite result. 524 U.S. at 753, 118

S.Ct. 2257 (stating "the factors we discuss below, and not the categories *quid pro quo* and hostile work environment, will be controlling on the issue of vicarious liability.")

**21.** Plaintiff is correct that *Walton* was a hostile environment case. However, the facts are largely identical and the categorization of a claim under *Faragher/Ellerth* should not effect whether an employer is vicariously liable.

F.3d at 1281–82; *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1311–12 (11th Cir.2001). *Walton* involved an employee who was allegedly pressured into having a sexual relationship with her supervisor. 347 F.3d at 1276–77. While the supervisor did not explicitly threaten the employee, the employee acquiesced to the supervisor's sexual advances and engaged in sexual acts because she was afraid of losing a promotion or her job or that the supervisor would kill her. *See id.* at 1289. After the employee reported the harassment as rape over two months later, and after an investigation and remedial action were taken by the employer, the employer terminated the employee at her request so that she would remain eligible for long term disability benefits. *See id.* at 1281–82. The Eleventh Circuit did not hold the employer automatically vicariously liable even though the employee claimed she was raped by her supervisor. Instead, the Eleventh Circuit concluded that while discharge was a "tangible employment action," the employer was not automatically liable because there was no evidence "that she [the employee] was discharged (as opposed to being harassed) *because of her sex.*" *See id.* at 1281 (emphasis in original).

Turning now to the second problem with the approach taken by the Second and Third Circuits (precluding the *Faragher/Ellerth* defenses in either submission or constructive discharge cases), this Court concludes that approach undermines the avoidable consequences doctrine which the Supreme Court incorporated into this area of law. *See Ellerth*, 524 U.S. at 764, 118 S.Ct. 2257. The Supreme Court's stated

goal in *Faragher/Ellerth* was to balance agency principles of vicarious liability with Title VII's basic policy of encouraging employers to promulgate and enforce anti-discrimination/harassment policies and encouraging employees to avoid the harm caused by harassment and discrimination by quickly reporting such misconduct quickly. The approach of the Second and Third Circuits discourages employees from avoiding or ending harassment and discrimination.[22]

■ In the Second Circuit, an employee faced with a *quid pro quo* proposition fares better by submitting to a sexual demand rather than refusing and immediately reporting it.[23] Similarly in the Third Circuit, an employee subjected to a hostile work environment created by a supervisor fares far better by quitting than by immediately reporting the misconduct. Both results seem contrary to the balance sought by the Supreme Court. Therefore, this Court concludes that Plaintiff's continued employment with the City after Chin's harassment began does not constitute a "tangible employment action" and does not preclude the *Faragher/Ellerth* defense.

The City offered to return Plaintiff to work at her same job without any contact with Chin. When Plaintiff declined the City's offer, the City offered to transfer her to another City agency at the same rate of pay. Plaintiff accepted that transfer.

■ A transfer undoubtedly could constitute a "tangible employment action." *See, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 512 (11th Cir.2000)(involving a reassignment). However, in this case, like in

---

**22.** It also encourages Plaintiffs' counsel to bring and fit facts into certain types or categories of harassment claims, the problem the Supreme Court in *Faragher/Ellerth* expressly tried to resolve. *Ellerth*, 524 U.S. at 753, 118 S.Ct. 2257.

**23.** This is especially true because the Second Circuit in *Caridad v. Metro–North Commuter R.R.*, concluded that a constructive discharge did not constitute a "tangible employment action." 191 F.3d 283, 294 (2d Cir.1999).

*Walton,* the transfer does not constitute a "tangible employment action" because of an agent's misuse of authority. *See Walton,* 347 F.3d at 1281; *also Frederick,* 246 F.3d at 1312. Plaintiff requested and consented to the transfer. The transfer is then not directly related to the harassing conduct of Chin. By directly related to the harassing conduct, this Court means that Chin did not have the City or Department transfer Plaintiff because she refused to engage in further sexual relations with him. This Court concludes that an employer is not liable for harassment when it takes a "tangible employment action" with an employee's consent or at an employee's request in an effort to remediate prior sexual harassment.[24] Therefore, the City may assert a *Faragher/Ellerth* affirmative defense in this case.[25]

### 2. Faragher/Ellerth Affirmative Defense

■ This Court concludes that the City meets the *Faragher/Ellerth* affirmative defense in this case and summary judgment should be granted. In order to successfully utilize the *Faragher/Ellerth* defense, an employer must prove that: (1) the employer exercised reasonable care to prevent and promptly correct the sexual harassment; and (2) the employee unreasonably failed to take advantage of any protective or corrective opportunities offered by the employer, or otherwise failed to avoid

harm. *See Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. A defendant employer must satisfy *both* elements to avoid liability and bears the burden of proof on *both* elements. *See Frederick,* 246 F.3d at 1312–13.

### a. Reasonable Care to Prevent Sexual Harassment

■■ As the Supreme Court explained, an employer does not always have to show a formal sexual harassment policy to meet its burden of proof of reasonable care. *See Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. Plaintiff concedes that the City promulgated a sexual harassment policy and disseminated that policy to all employees. But Plaintiff argues that the policy was not well known because it was "buried" in the personnel manual and the City did not conduct sexual harassment training for all employees. Plaintiff's argument about effective dissemination would have more merit if the City's personnel manual did not have a table of contents clearly identifying the location of the "Unlawful Employment Harassment" policy section by page number. Further, there is testimony that the sexual harassment policy was posted within the Department.[26] While it may be more effective to frequently and separately disseminate a sexual harassment policy, *Faragher/Ellerth* and their

**24.** Indeed, Plaintiff in her deposition admitted that she never wanted to come back to the Department after she accepted the transfer to the electric department. Instead, she wanted to "see if he would allow me to come back ... [t]o the department after I reported this sexual abuse on Sergeant Chin. They all cling together."

**25.** In her response, Plaintiff has not opposed summary judgment on her retaliation claims. This Court concludes that Plaintiff has failed to establish a *prima facie* case of retaliation because there is no evidence of a causal con-

nection between the adverse employment action and the protected activity.

**26.** The fact that Plaintiff does not remember seeing the policy posted in the Department does not mean that the policy was not posted. *See, e.g., Walton,* 347 F.3d at 1287 n. 13 (stating that "[t]he fact that neither Walton nor another employee remember receiving the policy (as opposed to being able to definitely testify that they never received it), is not particularly probative of whether Walton did in fact receive a copy of the policy.")

progeny do not require such measures for an employer to exercise reasonable care.[27] This Court concludes that the City exercised reasonable care under the circumstances of this case to prevent sexual harassment.[28]

### b. Reasonable Care to Correct Sexual Harassment

■■■ As to the reasonable care to correct element, an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to an employee's complaint of harassment. *See Frederick*, 246 F.3d at 1313–1314. Additionally, remedial measures are deemed reasonable when they " 'stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur.' " *Walton*, 347 F.3d at 1288 (quoting EEOC Notice 915.002, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, at § V.C.1.f. (June 18, 1999)).

■■■ Plaintiff argues that the City did not act reasonably to correct the harassment because the City did not fire Chin. This Court disagrees. The City immediately started an investigation and allowed Speaks to remain at home. This stopped the harassment and began the process of correcting the harassment's effects on Plaintiff. The City then offered Plaintiff her job back without Chin being her supervisor, or a job in another City depart-ment. This continued to correct the harassment's effects on Plaintiff. Finally, the City severely punished Chin by demoting, suspending, and transferring him (to a different squad on a different shift). Further, Chin was no longer allowed to supervise anyone. These actions ensured that Chin would not be able to harass Plaintiff or anyone else. This Court concludes that the City acted with reasonable care to correct the sexual harassment by Chin.

### c. Reasonable Care to Avoid Harassment or Otherwise Avoid Harm

■■■ Finally, on the reasonable care to avoid harassment element, the Supreme Court has commented that proof of a failure by the employee to use a complaint procedure "will normally suffice to satisfy the employer's burden." *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275. In *Walton*, the Eleventh Circuit held that waiting nearly three months to report a supervisor's sexual harassment (purportedly repeated sexual assaults) was not exercising reasonable care by an employee. 347 F.3d at 1290. Further, the Eleventh Circuit in that case rejected an employee's argument that subjective fears of reprisal excused her failure to report the harassment. *See id.* at 1290–91. The court stated that "[s]ubjective fears of reprisal may exist in every case, but ... those fears, standing alone, do not excuse an employee's failure to report a supervisor's harassment." [29] *Id.*

27. The remaining arguments of Plaintiff against the effectiveness of the policy are nothing, but unsupported conjecture. As part of its burden, the employer need not prove how many times the sexual harassment policy was effectively utilized.

28. While not raised by Plaintiff, this Court also concludes that the complaint procedures within the policy also demonstrate the employer's reasonable care in preventing sexual harassment. The policy presents employees alternative avenues of reporting sexual harassment other than through the harassing supervisor. Such policies have been repeatedly found reasonable by the Eleventh Circuit. *See Walton*, 347 F.3d at 1287; *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298–99 (11th Cir.2000)(concluding a similar policy was reasonable and listing other Eleventh Circuit cases).

29. Like in *Walton*, Plaintiff has not raised the issue of the City's liability alone for the first alleged sexual assault in May or June of 2001. 347 F.3d at 1291–92. This Court need not

at 1291.

It is undisputed that for over a year Plaintiff failed to take advantage of the City's and Department's complaint procedure. Indeed, Plaintiff's husband and not Plaintiff reported the harassment. Most, if not all, of the harm to Plaintiff could have been avoided by Plaintiff simply reporting Chin at the beginning of the harassment. Under these circumstances, this Court concludes that Plaintiff did not exercise reasonable care to avoid sexual harassment by Chin or otherwise avoid harm. Accordingly, this Court grants summary judgment to the City.

### B. PLAINTIFF'S STATE LAW CLAIMS

Plaintiff has additionally brought two state law claims against the City: (1) negligent retention; and (2) assault and battery. Neither claim deserves much attention and summary judgment is appropriate on both.

■ First, summary judgment is appropriate on Plaintiff's negligent retention claim because the record is completely barren of any notice that the City had that Chin had ever sexually harassed any other employee. Indeed, Plaintiff concedes that she found no admissible evidence to support her claim. When an employer fails to take a corrective action against an employee because the employer had no notice of problems with the employee's fitness, that employer is not liable under Florida law for negligent supervision or retention. *See Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.,* 783 So.2d 353, 358 (Fla. 3d DCA 2001); *M.V. v. Gulf Ridge Council Boy Scouts of America, Inc.,* 529 So.2d 1248, 1248 (Fla. 2d DCA 1988). Therefore, this Court grants summary judgment on Plaintiff's negligent retention claim.

■ Second, summary judgment is appropriate on Plaintiff's assault and battery claims because there is no evidence that the sexual assaults of Plaintiff by Chin were the kind of conduct that Chin was employed to perform or were undertaken to further the City's or Department's interests. *See Iglesia,* 783 So.2d at 357–58; *Agriturf Mgmt., Inc. v. Roe,* 656 So.2d 954, 955–56 (Fla. 2d DCA 1995); *City of Green Cove Springs v. Donaldson,* 348 F.2d 197, 202 (5th Cir.1965); *Grice v. Air Products and Chemicals, Inc.,* No. 3:98–cv–205, 2000 WL 353010 (N.D.Fla. Feb. 17,2000)(granting summary judgment assault and battery claim in sexual harassment case); *Resley v. Ritz–Carlton Hotel Co.,* 989 F.Supp. 1442, 1448 (M.D.Fla.1997) (granting summary judgment on assault and battery claim in sexual harassment case); *also Carter v. America Online, Inc.,* 208 F.Supp.2d 1271, (M.D.Fla.2001)(granting summary judgment on a intentional infliction of emotional distress claim brought by sexually harassed employee).

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant City of Lakeland's Motion for Summary Judgment (Dkt.# 54) is **GRANTED.**

2. The Clerk is directed to enter a judgment in favor of the City against Plaintiff.

3. The Clerk is directed to terminate all pending motions as moot and close this case.

consider in this case the "practical difficulties" of applying *Faragher/Ellerth* to a "sudden sexual harassment case." As the Eleventh Circuit noted in *Walton,* there is a wide difference of opinion in this area. *See id.*