[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 4, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12790

_____

D. C. Docket No. 03-00147-CV-5-MCR

CHRISTINA OLSON,

Plaintiff-Appellant,

versus

LOWE'S HOME CENTERS INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(May 4, 2005)

Before EDMONDSON, Chief Judge, and DUBINA and HULL, Circuit Judges.

HULL, Circuit Judge:

Christina Olson appeals from the district court's grant of summary judgment

for her employer, Lowe's Home Centers, Inc. ("Lowe's"), on her sexual-

harassment and retaliation claims under Title VII and Florida state law. After review and oral argument, we reverse as to Olson's sexual-harassment claim, but affirm as to Olson's retaliation claim.

## I. FACTUAL BACKGROUND

### A. The Alleged Harassment

In March 1999, plaintiff Olson began working for Lowe's as a desk clerk. In August 2001, Olson was promoted to head cashier. On March 2, 2002, Ron Senkle became the manager of Olson's department. Senkle supervised all cashiers, including Olson.[1]

In April 2002, Senkle began making sexual comments to Olson. The comments started out slow, about once a week. They grew in frequency until they occurred once or twice every shift Olson worked with Senkle for approximately 2½ months.

Specifically, Senkle's comments were: (1) stating Olson's ass looked good in her blue jeans; (2) stating Olson had a headache because she must not have gotten any last night; (3) stating he knew how to get rid of Olson's headache because he had the magic touch; (4) stating his magic wand could fix anything;

---

[1]Lowe's management hierarchy consists of a store manager, assistant store managers who report to the store manager, and department managers who report to the assistant store managers. Senkle was the department manager of Olson's department. Dale Yori was the store manager.

(5) asking if Olson wanted him to call her husband and tell her husband to give her some sex; (6) asking if Olson wanted him to call her husband and give him some tips to ease her tension by giving her sex; and (7) telling Olson that she would not be such a bitch if her husband would give her sex. According to Olson, as time went on, the sexual comments "started getting more vulgar, more worse, more unacceptable." Olson periodically told Senkle to stop making such comments and to leave her alone, but the comments continued.

Senkle's physical contact with Olson involved one kissing and two rubbing incidents. The rubbing incidents occurred when Senkle was working behind Olson at the cash register. In the process of reaching for the register, Senkle would rub the front of his body against the back of Olson's body.[2] According to Olson, she could feel "the whole front of his body up against the back of mine."

The kissing incident occurred on July 6, 2002, after Olson found a misplaced, important document that Senkle and Leo McNaron, an assistant manager, needed to tally the day's receipts. Olson took the document to the room in which Senkle and McNaron were present. McNaron asked for, and received permission from, Olson to give her an appreciative hug.

_____

[2]The record is unclear about exactly when these rubbing incidents occurred.

3

Olson then gave the document to McNaron. Afterwards, Senkle grabbed Olson's right arm, pulled her towards him, grabbed her head, pulled it down towards him, and kissed Olson. Senkle then let go of Olson. Treating physicians determined that Olson suffered physical and psychological injuries from the kissing incident.[3] Due to her injuries, Olson was put on light duty.

**B.    Olson's Complaints**

In her deposition, Olson devotes 20 pages to describing Senkle's sexual comments and physical contact. Immediately after describing the sexual harassment, Olson testified that she informed Judy Hall, a department manager, about what Senkle was saying to her, as follows:

Question:    Did you ever tell any member of management that you did not want [Senkle] to work with you because of the statements he was making to you?

Olson:    Yes.

Question:    Who did you tell?

Olson:    Judy Hall

Question:    And what position did Judy Hall have?

---

[3]Specifically, Olson was diagnosed as having a cervical sprain, facial pain, tension headache, intermittent right radicular pain and numbness, and post-traumatic stress syndrome accompanied by anxiety, depression, headache, difficulty concentrating, and apprehension of going back to work.

Olson:     She was, at the time, if I recall, she was a department manager of millworks.

. . .

Question:  Did you ask Judy Hall to tell anybody else?

Olson:     . . . Judy Hall informed me that she was going to tell Sandra Bell.

Question:  And who was Sandra Bell?

Olson:     Sandra Bell was a -- she was in charge of three different departments.  And I think she was an MOD.

Question:  Why didn't you tell Sandra Bell anything?

Olson:     Because I trusted Judy, and she was friends with Sandy Bell, and she assured me that she would tell Sandy.

Question:  Did you ever tell Judy not to report anything or tell anybody else about what you had told her?

Olson:     No.[4]

Question:  And how many times did you go to Judy Hall to complain about what Ron Senkle was saying to you or about you?

Olson:     I can recall two incidents that I talked to Judy Hall about Ron Senkle.

. . .

---

[4]In contrast, according to Hall, Olson "didn't want the incident blown out of proportion or reported because [Senkle] has so many friends throughout the store, and [Olson] thought that it would – everybody would be against her [Olson] . . . ."

Olson:      There was an incident when I went to break, and she was in the back on break. And I was upset. And she asked me, you know, "Chris, what's wrong?" And I said, "Well, I have to work with Ron. And there's things that he's saying that are, you know pretty out there." Or I would tell . . . her about how he had approached me or some things that he would say. She would say to me, "Well, I have to go to lunch with Sandy today. Let me talk to her, and I'll get back to you." Then there was an incident after I had said to her, that I seen [sic] her again, and she asked me, "well, what did [Senkle] say to you today?" And then I would tell her something that he would say [sic]. . . .

Question:   Well, how many times did you go to Judy Hall with the intent to have Ms. Hall report your complaints about Ron Senkle?

Olson:      I can recall twice.

Question:   And the first time was when you were upset?

Olson:      Yes:

Question:   And the second time was when?

Olson:      The second time is when I was on break and she was on break, and I ran into her back there, and she approached me saying, "So, what is [Senkle] doing today?" And I would tell her what either [Senkle] said to me or what comments that he made, or so on and so forth.

Question:   And at that time did you ask her or tell her to report that to management?

Olson:      No, she told me she was going to report it.

Question:   Did you ask her to report it?

Olson:      I did say to her that something needed to be done about [Senkle].

6

Hall herself acknowledged that what Olson was reporting was sexual harassment. In her deposition, Hall testified that, after her first meeting with Olson, she informed Olson "that if [Olson] told [Senkle] to stop and he continued to do it, that would be considered sexual harassment at that point." Thus, in the light most favorable to Olson, the evidence shows that Olson reported Senkle's comments to Hall, and Hall considered them sexual harassment.[5]

As explained later, Lowe's policies provided that an employee could complain to any "member of management." According to both Olson and Hall, Hall was an appropriate member of Lowe's management to report incidents of sexual harassment.

After these two complaints to Hall, Olson also complained to Hall about the kissing incident on July 9, 2002. Hall reported Olson's complaint to assistant store manager Bell, who took Olson to human resources representative Flo Conway. The incident was reported immediately to store manager Dale Yori, who interviewed Olson, Bell, Senkle, and McNaron. Within hours of Olson's July 9 complaint, Lowe's terminated Senkle for sexual harassment.[6]

_____

[5]Olson admits that she did not specifically label Senkle's conduct "sexual harassment" when speaking with Hall. However, Olson contends that she reported to Hall what Senkle was saying, and Hall's testimony is some evidence that Hall considered Senkle's comments to constitute sexual harassment.

[6]Olson had three meetings with store manager Yori about the kissing incident. At the first meeting, Olson explained to Bell, Conway, and Yori what had happened. During the

7

After the kissing incident, Olson was placed on light duty. According to Olson, employees were upset with her because she was responsible for Senkle's firing. Hall informed Olson that Olson's new supervisor, Lisa Lewis, was trying to get Olson fired.

Olson stopped working in April 2003 after Conway told her that no more light duty positions were available. In September 2003, Olson was again told that there were no light duty positions available. Olson has not reported for work at Lowe's since April 2003.

## C.    Lowe's Sexual-Harassment Policy

Lowe's has a well-established policy against sexual harassment, as well as an "Open Door Program" for employees to report sexual harassment.[7] Upon being hired in March 1999 and thereafter, Olson received or read several documents outlining Lowe's sexual-harassment policies and designating a number of different persons to whom sexual-harassment complaints could properly be reported.

During her orientation in March 1999, Olson signed a document titled "Notice of Lowe's Policies." The orientation notice directed employees to notify

_____

second meeting, Yori asked Olson to put her complaint in writing. At the third meeting, Yori told Olson that he had terminated Senkle.

[7]Lowe's also refers to the Open Door Program as the Open Door Policy. Except where documents are quoted, we refer to the program as the Open Door Program.

their "store/location manager" of any sexual harassment, and to call or write

Lowe's internal audit department if satisfactory action was not taken.[8]

In the orientation room, Olson also observed Lowe's posted notice that

stated that employees were to notify their "store/location manager" of any sexual

harassment. If satisfactory action was not taken, the posted notice provided that

employees could call or write Lowe's internal audit department or could report the

harassment anonymously via a toll-free number.[9]

In March 1999, Olson also received Lowe's "New Orientation Guide and

Employment Package" ("The Guide").[10] The Guide, unlike the above notices,

---

[8]The orientation notice stated, in relevant part:
DISCRIMINATION, INCLUDING SEXUAL HARASSMENT, BY SUPERVISORS FELLOW EMPLOYEES OR CUSTOMERS IS STRICTLY AGAINST POLICY AND WILL NOT BE TOLERATED. . . .
IF YOU ARE SUBJECTED TO DISCRIMINATION, INCLUDING SEXUAL HARASSMENT, OR IF YOU ARE AWARE OF A VIOLATION OF ANY OF THE POLICIES ABOVE, REPORT IT IMMEDIATELY TO YOUR STORE/LOCATION MANAGER . . . . IF IMMEDIATE SATISFACTORY ACTION IS NOT TAKEN, CALL OR WRITE LOWE'S INTERNAL AUDIT DEPARTMENT . . . .

[9]The posted notice provided, in relevant part:
. . . If you are subjected to discrimination, including sexual harassment, or if you are aware of a violation of any of the policies above, report it immediately to your Store/Location Manager, Area General Manager/Director . . . or if immediate satisfactory action is not taken, call or write: Lowe's Internal Audit Department . . . or to remain anonymous, call THE NETWORK . . . .
Olson saw the Posted Notice at orientation, but it soon disappeared.

[10]The record does not contain the exact version of The Guide that Olson received in 1999. In her deposition, Olson testified that she received a document that was the same as or similar to the Guide that was revised on July 2002. Flo Conway, Lowe's human resources representative,

9

stated that employees first should confront the harasser and inform him that the behavior was offensive. If the harassment did not stop, the Guide provided a series of steps to take, starting with calling several numbers and contacting the assistant manager. If the problem was not resolved satisfactorily, the Guide outlined these additional steps: the employee should contact the store manager and then the district manager, and send a letter to the Regional Human Resources Director.[11]

In 2000, Olson signed another document titled "Store Verification Log, Sexual Harassment in the Workplace," which provided that an employee should

_____

testified that the policies and procedures set forth in the Guide remained basically the same throughout Olson's employment. Thus, in the absence of any evidence to the contrary, we accept that the 2002 version of the Guide reflects the procedures in place under the Guide during Olson's orientation in 1999.

[11]The July 2002 version of the Guide states, in relevant part:
If you are being harassed – Confront the Harasser: Clearly state that the behavior is offensive and that it should stop.
If the harassment doesn't stop, refer to the Open Door Policy or if at any time you are uncomfortable approaching management directly, call the Fairness Programs office . . . , Internal Audit (collect) . . ., or the AlertLine . . . .

The Guide further explains the Open Door Program, as follows:
STEP 1 - Talk to your Assistant Manager. Generally, you and your Assistant Manager will be able to resolve the problem. If your Assistant Manager does not resolve the problem, talk to your Store Manager.
STEP 2 - If you do not feel that your problem was resolved after taking these steps, contact your District Manager at his/her base store. If the District Manager is not available, leave a message with the store phone operator or with the District Manager's answering machine. Please leave your name, store number, a contact phone number and the best time for the District Manager to call you back. You will receive a return phone call within 72 hours.
STEP 3 - If your problem has not been resolved to your satisfaction at this point, or if you do not feel that you can follow the procedure outlined above, send a letter to your Regional Human Resources Director at the Regional Office. . . .

report harassment to the "location manager" or the Human Resources Manager.[12] Again, if the employee was unsatisfied with the response, the employee should contact Lowe's Internal Audit Department or use a toll-free number to report the harassment.

In 2000, Lowe's published a document titled "Lowe's Commitment to Employees," which provided that an employee may report complaints to their supervisor or "any other member of management."[13] According to both Olson and Hall, the Open Door Program allowed employees to complain to any member of management, such as Hall.

---

[12]The Store Verification Log provided, in relevant part, as follows:
I understand that claims of discrimination, including sexual harassment should be reported directly to the location manager or Human Resources Manager. In addition, I understand that if the issue is not addressed at the Location, District, or Regional level that the issue should be reported to Lowe's Internal Audit . . . or the Alertline.
. . .
I certify that I have received a copy of Lowe's "Sexual Harassment in the Workplace" booklet. I understand that Lowe's is committed to providing a work environment free from discrimination or harassment of any kind. In addition, I am aware of Lowe's Open Door Policy and that as an employee I must report all complaints of harassment, including sexual harassment or any other form of unlawful harassment through Lowe's Open Door Program.

[13]The Open Door Program provided:
. . . Under this program, an employee may discuss with his or her supervisor any work-related matter. If the employee would rather talk to someone other than his or her supervisor, the Open Door Program enables the employee to speak with any other member of management. If an employee would feel more comfortable speaking with someone outside of management and/or speaking with someone on an anonymous basis, he or she can use the Lowe's Alertline, a telephone service established to receive employee concerns. . . .
(Emphasis added).

11

## II. PROCEDURAL HISTORY

Olson's complaint against Lowe's alleged sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Florida Civil Rights Act of 1992, Fla. Stat. ch. 760.01, et seq. Granting Lowe's motion for summary judgment,[14] the district court concluded that Senkle's behavior did not create a hostile work environment because his comments were not severe or threatening, and did not interfere with Olson's job performance. Further, the district court noted that Senkle was promptly terminated after the "kissing incident."

Even if Senkle's conduct was considered severe and pervasive, the district court concluded that Lowe's established its affirmative defense under Faragher/Ellerth,[15] because: (1) no tangible employment action was taken against

---

[14]"We review the district court's order granting summary judgment de novo." Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1296 (11th Cir. 2000). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Id. (internal quotation marks and citations omitted)
    Further, claims under Chapter 760.01, Florida Statutes, are analyzed using the same framework as claims under Title VII. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998). Therefore, we analyze Olson's state and federal claims together.

[15]In two cases decided the same day, Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998), the Supreme Court established an affirmative defense for an employer for an actionable hostile work environment created by a supervisor, which may be raised if no tangible employment action has been taken. See Faragher, 524 U.S. at 807, 141 S. Ct. at 2292-93.

Olson; (2) Lowe's effectively disseminated an anti-harassment policy to its employees; and (3) Olson failed to properly report the harassment because Hall was not a person designated to receive complaints under Lowe's policy.[16]  Further, the district court concluded that Olson failed to establish her retaliation claim because: (1) she did not suffer an adverse employment action; and (2) there was no causal relationship between Olson not being assigned a light-duty position and her harassment complaints nine months earlier.

### III. DISCUSSION

**A.     Sexual-Harassment Claim**

To establish a hostile-environment sexual-harassment claim, an employee must show:

> (1) that [] she belongs to a protected group; (2) that the employee has
> been subject to unwelcome sexual harassment, such as sexual
> advances, requests for sexual favors, and other conduct of a sexual
> nature; (3) that the harassment must have been based on the sex of the
> employee; (4) that the harassment was <u>sufficiently severe or pervasive
> to alter the terms and conditions of employment and create a
> discriminatorily abusive working environment</u>; and (5) a basis for
> holding the employer liable.

---

[16]The district court concluded that Hall's and Olson's understanding that complaints under the Open Door Program could be made to any manager did not create a genuine issue of material fact because the July 2002 written policy disseminated to the employees required that reports be made to the store manager or assistant store manager.  Thus, the district court found that Olson's complaints to Hall were informal and did not give Lowe's notice of Senkle's behavior because Hall was not a person designated to receive complaints under the policy.

13

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (emphasis added). "Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." Id. at 1246. As to the subjective component, the employee must "subjectively perceive" the harassing behavior as being sufficiently severe or pervasive to alter the terms or conditions of her employment. Id.

As to the objective component, "[t]he [work] environment must be one that a reasonable person would find hostile or abusive [, . . . which] should be judged from the perspective of a reasonable person in plaintiff's position considering all of the circumstances." Id. The four factors in making this determination are: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. In addition, "courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive." Id.

We first conclude that Senkle's conduct as a whole was sufficiently severe or pervasive as to alter the terms and conditions of Olson's employment. For

14

example, Senkle's conduct was sufficiently frequent. Olson testified that, over a span of 2½ months, Senkle subjected her several times a week to offensive sexual comments, and touched her at least three times (a kissing and two rubbing incidents). There is some evidence that Senkle's sexual comments increased and eventually were made every shift.

The conduct was also sufficiently severe. Senkle's frequent comments were explicitly sexual in nature and became increasingly more vulgar. Senkle's conduct also was physically threatening and humiliating. Senkle rubbed his entire body (not merely a hand or hip) against Olson on two occasions. The rubbing was forcible and not mere brushes. Olson even sustained injuries from the kissing incident. Olson repeatedly tried to avoid Senkle at work because of his continuing sexual comments. The kissing incident rendered Olson physically unable to work at the same level as before the incident, and she ended up on light duty. Thus, Olson has presented sufficient evidence that the conduct also interfered with her job. See Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1366 (11th Cir. 1999).

Olson's case is similar to Johnson v. Booker T. Washington Broadcasting Service, Inc., where this Court concluded that the conduct was sufficiently severe or pervasive to constitute sexual harassment. 234 F.3d 501, 509 (11th Cir. 2000). The Johnson Court determined that the defendant's conduct:

15

was not infrequent (Johnson points to roughly fifteen separate instances of harassment over the course of four months); the conduct was severe (Donnell's behavior included giving Johnson unwanted massages, standing so close to Johnson that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts); the conduct was physically threatening and humiliating (same); and the conduct interfered with Johnson's job performance (she could not get along with her on-the-air co-host). This set of facts differs from cases like Mendoza and Gupta v. Florida Bd. of Regents, where there were fewer instances of less objectionable conduct over longer periods of time.

Johnson, 234 F.3d at 509 (internal citations omitted).

Like Johnson, this case involves frequent instances of sexual harassment over a short period of time, and unwanted physical touching. Indeed, the sexual comments grew in frequency to every shift; there were three incidents of physical contact; and Olson was actually physically injured by Senkle's behavior. See Hulsey v. Pride Restaurants, LLC., 367 F.3d 1238, 1248 (11th Cir. 2004) ("Garrison's conduct was frequent, occurring at least 18 times during the approximately 2 to 2-1/2 weeks between his initial attempt to get Hulsey to date him and her termination on August 16, 2001."). Thus, Olson's evidence is sufficient to establish a hostile-environment sexual-harassment claim.

## B.   Faragher/Ellerth Affirmative Defense

If an employee has established a hostile-environment sexual-harassment claim but no tangible employment action was taken, an employer "may raise an

affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270. To establish the affirmative defense, Lowe's must show that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) that Olson "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Lowe's] or to avoid harm otherwise." Faragher, 524 U.S. at 807, 118 S. Ct. at 2293; see Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270 (same). "Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted). Further, the first element of the affirmative defense has two prongs: (1) reasonable care to prevent sexual harassment and (2) reasonable care to correct sexual harassment. Id. at 1314.

We readily conclude that Lowe's has satisfied the prevent prong of the Faragher/Ellerth affirmative defense. Lowe's clearly exercised reasonable care to prevent sexually harassing behavior by promulgating and effectively disseminating several fairly extensive anti-harassment policies to employees. Lowe's policies

enabled employees to bypass harassing supervisors and provided several different avenues for employees to report sexual harassment.[17]

The more difficult question is whether Lowe's has established the second prong of the affirmative defense: that Olson unreasonably failed to take advantage of Lowe's preventative and corrective opportunities.[18]

In defining the contours of what it means to reasonably use the complaint procedures and, thereby, properly report sexual harassment, this Court has identified two elements that must be satisfied. Olson must have complained to the appropriate person at Lowe's. See Madray, 208 F.3d at 1300 ("This inquiry is facilitated by the identification of the 'appropriate Company representative' to whom employees should register their complaints in the [employer's] sexual harassment policy"); Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir.

___

[17]See Walton v. Johnson and Johnson Servs., Inc., 347 F.3d 1272, 1287 (11th Cir. 2003) ("The company's anti-harassment policy provides an alternative channel for making complaints other than the harassing supervisor."); Madray, 208 F.3d at 1299 (determining that the sexual-harassment policy in the case was sufficient "because the procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple avenues of lodging a complaint to assessable, designated representatives").

[18]As stated in Faragher, "while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." Faragher, 524 U.S. at 807-808, 118 S. Ct. at 2293.

2000) ("Through its policy, the employer has given the designated person explicit actual authority to handle the complaints.").

Second, if Hall was an appropriate person under Lowe's complaint procedures, Olson's conversations with Hall must be sufficient to put Lowe's on notice of the sexual harassment. See Coates, 164 F.3d at 1364.

## C.    The Appropriate Person

We first conclude that Hall was an appropriate "person" for Olson to report sexual harassment. Lowe's Open Door Program states: "If the employee would rather talk to someone other than his or her supervisor, the Open Door Program enables the employee to speak with any other member of management." Lowe's does not dispute that Hall is a member of management. Further, both Olson and Hall testified that Hall was an appropriate person under the Open Door Program. See Breda, 222 F.3d at 889 ("When an employer has a policy for reporting harassment that is clear and published to its employees, and an employee follows that policy, the employer's notice of the harassment is established by the terms of the policy. Through its policy, the employer has given the designated person explicit actual authority to handle the complaints."); Coates, 164 F.3d at 1364 (noting that by its sexual-harassment policy the employer "itself answered the

question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial action").[19]

## D.    Adequacy of Notice

The closer issue is whether the two meetings between Hall and Olson were sufficient to place Hall, and therefore Lowe's, on notice of Senkle's sexual harassment.[20] As to the first meeting, Olson was in a breakroom at Lowe's when she first spoke with Hall regarding Senkle's sexual comments. Olson was upset, and Hall asked her what was wrong. According to Olson, she informed Hall that she has "to work with [Senkle] . . . [a]nd there's things that he's saying that are pretty, you know, out there." Olson then proceeded to inform Hall about some of Senkle's comments and that she did not want to work with Senkle because of the statements he was making. At this first meeting, Hall, by her own admission, then informed Olson "that if [Olson] told [Senkle] to stop and he continued to do it, that would be considered sexual harassment at that point." According to Olson, Hall

---

[19]We recognize that Lowe's provided several means to report sexual harassment, such as calling a toll-free number or writing to Lowe's Internal Audit Department. However, these are alternative means by which Olson could have put Lowe's on notice of the harassment. The fact remains that Hall was a manager and Lowe's Open Door Program clearly allows employees to complain to "any member of management." Consequently, the district court erred in concluding that Olson did not complain to an appropriate person under Lowe's policies.

[20]In this case, there is some factual dispute regarding the nature of the conversations between Olson and Hall. However, at the summary judgment stage, we must review the facts in the light most favorable to plaintiff Olson. Manders v. Lee, 338 F.3d 1304, 1306 n.1 (11th Cir. 2003).

assured her that she would inform Sandra Bell, an assistant store manager, about Senkle's conduct. Given Hall's own reference to sexual harassment and that she would take action by informing Bell, a reasonable factual inference is that Hall was aware that the behavior Olson was reporting to her constituted sexual harassment.[21]

On the second occasion, Olson and Hall were again on break in a backroom at Lowe's, and Hall approached Olson and asked, "so, what is [Senkle] doing today?" Olson informed Hall about the recent comments Senkle had made and told Hall "that something needed to be done about Ron." Although Olson told Hall that something needed to be done about Senkle, Olson never specifically used the term "sexual harassment."[22] Again, according to Olson, Hall said she would report Senkle's behavior to other members of management.

Given Olson's two complaints and Hall's alleged responses to them, we conclude that a factual issue exists about whether Olson reasonably took advantage

---

[21]In contrast to Olson's testimony, Hall testified that, at the first meeting, Olson "didn't want the incident blown out of proportion or reported because [Senkle] has so many friends throughout the store, and [Olson] thought that it would – everybody would be against her . . . ." If Olson did not want Senkle's comments reported or acted upon, then Lowe's would not have been placed on proper notice of the harassment and, therefore, would be entitled to the Faragher/Ellerth affirmative defense. However, Olson specifically denies that she told Hall or anyone else that she did not want the incident reported.

[22]There is no magic word requirement. That is, the employee need not label the events "sexual harassment" in order to place an employer on notice of the offending behavior. However, a jury certainly would be free to consider such evidence, as part of a bigger picture, when evaluating whether the substance of Olson's complaints to Hall were sufficient to place Lowe's on notice of her sexual-harassment claim.

of Lowe's preventative and corrective opportunities.  See Breda, 222 F.3d at 890.

Accordingly, we conclude that the district court erred in granting summary judgment to Lowe's on Olson's sexual-harassment claims.[23]

We recognize that Lowe's also contends that Olson did not take reasonable advantage of its policies as a matter of law because she failed to (1) pursue other, alternative means of reporting the harassment, or (2) report the harassment to additional supervisors once she did not receive any word from Hall that corrective action was being taken.  This contention lacks merit because under the Open Door Program, there is no requirement that employees must pursue additional steps once they report harassment to a member of management.[24]  In addition, Olson testified

_____

[23]In reaching this conclusion, we recognize that Olson's complaints to Hall were in the informal setting of the breakroom at Lowe's.  In Madray, this Court addressed a situation in which an employee complained to individuals in an informal setting away from the workplace. The Madray Court, however, rested its decision primarily on the fact that the persons to whom the employee complained were not authorized or designated persons to accept complaints under the employer's sexual-harassment policy.  Madray, 208 F.3d at 1299-300.
   Further, in Madray, we also assumed that even if the plaintiffs complained to the appropriate persons, "the context surrounding the plaintiff's comments to these individuals compels the conclusion that these mid-level managers could not reasonably have been expected to act to address the plaintiffs' complaints."  Id. at 1300 (citing Coates, 164 F.3d at 1365).  In fact, the plaintiff in Madray complained to unauthorized individuals while at a restaurant.  Id. Olson's case is different from Madray because: (1) Hall, unlike the individuals in Madray, was an authorized and designated person at Lowe's to receive complaints regarding sexual harassment; (2) according to Olson, Hall twice assured her that she would report her complaints to Bell; and (3) the complaints occurred while at Lowe's.

[24]See Breda, 222 F.3d at 890 ("Furthermore, employees of such companies who believe they are victims of harassment need not be concerned with whether they pursued their complaints far enough up the company ladder."); Madray, 208 F.3d at 1302 (noting that "an employer cannot use it own policies to insulate itself from liability by placing an increased burden on a complainant to provide notice beyond that required by law" (internal quotation

that Hall told her twice that she would report the harassment to other members of management. It was not unreasonable per se for Olson to rely on such assurances.

## F. Lowe's Corrective Action

Having concluded that a triable issue of fact remains as to whether Olson unreasonably failed to take advantage of Lowe's preventative or corrective opportunities, we briefly discuss the "correct" prong of the Faragher/Ellerth defense. When correcting sexual harassment, "an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." Frederick, 246 F.3d at 1314. Furthermore, "the question of whether an employer timely acted to correct harassment turns on when it had proper notice of an employee's harassment complaint." Id. at 1315.[25]

If the trier of fact determines that Olson unreasonably failed to take advantage of Lowe's preventative or corrective opportunities until the kissing incident, it is clear that Lowe's promptly took corrective action – by firing Senkle – and would be entitled to the Faragher/Ellerth affirmative defense. See Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 422 (11th Cir. 1999). For

marks, brackets, and citations omitted)).

[25]See Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1299 (11th Cir. 2000) ("[W]e must determine when Publix had notice of Selph's harassing behavior in order to determine the alacrity of its response."); Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir. 1999) ("Only if we determine that adequate notice of the harassment was given to Sundor do we then move to determine whether Sundor responded reasonably to her complaint.").

example, if the jury determines that Olson still did not want Senkle's behavior reported (a fact she denies) or if she otherwise failed to convey the severity/frequency of Senkle's comments to Hall, then Olson would not have provided Hall (or Lowe's) with sufficient notice of the harassment to trigger Lowe's corrective duty. See Coates, 164 F.3d at 1364-66. If Olson did not want Senkle's behavior reported or failed to convey the severity/frequency of Senkle's comments, Hall could have reasonably believed that: (1) her first conversation with Olson resolved the matter and that no further action was necessary; and (2) that during the second conversation Olson was speaking with Hall as a friend and not a member of management. See id; Breda, 222 F.3d at 890.

Therefore, this case turns on whether Olson adequately notified Hall of the severity/frequency of Senkle's comments and that she wanted Senkle's behavior addressed. Lowe's cannot be held liable for the kissing incident or other forms of the alleged sexual harassment unless Olson adequately notified Hall of the sexual harassment. See Frederick, 246 F.3d at 1315 ("the question of whether an employer timely acted to correct harassment turns on when it had proper notice of an employee's harassment"); Dees, 168 F.3d at 422 ("the employer's notice of the harassment is of paramount importance [because] if the employer had notice of the harassment . . . then it is liable unless it took prompt corrective action").

24

## G.    Retaliation Claim

Olson also argues that the district court erred in granting summary judgment in favor of Lowe's on her retaliation claim.  In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements:

> (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision.

Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000).  Olson engaged in statutorily protected activity by complaining about the sexual harassment.  Thus, the question is whether Olson suffered an adverse employment action and whether that action was causally related to her complaints.

An adverse employment action is defined as "an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Id. (internal quotation marks and citations omitted). "Conduct that falls short of an ultimate employment decision must meet some threshold level of substantiality," which is evaluated "using both a subjective and an objective standard." Id. (internal quotation marks and citation omitted).  "To establish a causal connection, a plaintiff must show that the decision-makers were

25

aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." Id. at 590 (internal quotation marks and citation omitted). "For purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'" Id.

In this case, Olson argues that the April 2003 communication informing her that no light duty positions were available constituted an adverse employment action. Even assuming arguendo that the communication is an adverse employment action, the communication occurred at least nine months after Olson reported Senkle's behavior. This is insufficient to show close temporal proximity. See Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the protected activity and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law."); Gupta, 212 F.3d at 590.

We recognize that Olson also asserts that a causal relationship exists because Hall informed Olson that Olson's new supervisor, Lisa Lewis, was trying to get Olson fired. However, Olson has produced no evidence that any alleged actions of Lewis are related at all to the April 2003 communication about light duty positions. See Gupta, 212 F.3d at 590. Because there is no evidence of a causal connection

26

between the protected activity in 2002 and the 2003 communication, the district court did not err in granting summary judgment in favor of Lowe's on Olson's retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, we vacate and remand the district court's grant of summary judgment in favor of Lowe's on Olson's sexual-harassment claims under federal and state law. We affirm the district court's grant of summary judgment in favor of Lowe's on Olson's retaliation claims under federal and state law.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

EDMONDSON, Chief judge, concurring in result.

I agree that we must affirm the judgment for Defendant on the retaliation claim. I also agree that plaintiff is due a trial on the merits for her sexual harassment claim. I write separately to explain briefly my view of the application of the Faragher/Ellerth defense in the case.

The problematic point, for me, is whether plaintiff has evidenced facts that would allow a reasonable jury to find that plaintiff reasonably took advantage of the preventive and corrective opportunities provided by Lowe's Home Centers, Inc. In this case, this fact is important: the employer offered a wide array of ways for an employee to report meaningfully to this big company that the employee believed she was being sexually harassed. For example, there is an 800 telephone number to the national corporate headquarters. In addition, Lowe's publishes several guides outlining steps on how to deal with harassment, which designate several people, including the assistant manager, store manager, and district manager, to receive complaints. And, Lowe's provides the address of its internal audit department for employees who feel more comfortable writing the company about their claims.

Plaintiff did report the sexual harassment to a low level supervisor: twice actually. But she did this reporting orally and on occasions where she seemingly

28

just happened to encounter the supervisor, who was not the employee's or the

harasser's supervisor or in the employee's chain of command or specifically listed

as someone to whom such complaints ought to go.  I recognize that, among the

ways Lowe's provided its employees to complain, a so-called open-door policy

existed that allowed an employee to complain to any member of management.

Mainly because she did twice complain to some supervisor, I reluctantly accept

that a jury could find that plaintiff reasonably took advantage of what Lowe's

offered.  I also believe, however, that a jury could easily find that plaintiff, given

all of the circumstances, did not take reasonable advantage of the available

corrective opportunities, considering the variety of available alternatives for

reporting.

Put differently, I stress that, when an array of reporting mechanisms are

available, the use of one and one only is not per se reasonably taking advantage of

all that is offered.  This conclusion seems especially true where the employee does

not get prompt relief from the mechanism -- one of many -- that she chooses to use

to complain.  To expect an employee to complain more than once or twice or to

expect her to use more than one mechanism to stop conduct that the employee

finds objectionable is not unreasonable.  Real world experience has taught many of

us that it is pretty uncommon for one or two casual complaints to end a problem of

any kind, for example, getting a car repaired, a bill corrected, and so on. The extended period of sexual harassment plaintiff says she endured seems not so much related to a wishy-washy leniency on Lowe's part toward harassment, but to a wishy-washy attitude on plaintiff's part toward seriously reporting the harassment to Lowe's.

Meaningful notice of ongoing harassment to a national corporation is the goal in a case like this one. Lowe's as well as plaintiff is in a genuine way the harasser's victim. It is the national corporation that will pay the damages: not a low level supervisor and not the harasser. The idea of Faragher, as I understand it, is to allow the employer a fair chance to avoid liability for conduct that the employer in fact does not approve and will stop if given a reasonable chance. Employers who offer a variety of mechanisms for complaint are taking a step that probably makes it more likely that misconduct will be reported and stopped. Sometimes one mechanism will be tried and work; sometimes another. An employer should not be penalized for offering a variety of mechanisms: a plaintiff employee's utilization of one complaint mechanism out of a variety of mechanisms is not automatically enough to allow a factfinder to find that the plaintiff reasonably took advantage of the overall opportunities offered by the employer.

In my view, the mechanism of complaint selected by plaintiff in this case was foreseeably likely to be the least effective way to get notice high enough up in Lowe's management so that something corrective would actually happen. Given the overall system of mechanisms of complaint Lowe's offered, I believe that, in these circumstances, it is a close question whether plaintiff did "unreasonably fail[] to take advantage of any preventive or corrective opportunities provided by [Lowe's] or to avoid harm otherwise." Faragher, 118 S.Ct. at 2293. I understand why the district court thought that plaintiff, as a matter of law, had "unreasonably failed." Still, although I have doubts about it, I accept that the question can properly go to a jury.